**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **In re:** ) | **Case No.: 18-41671** |
| ) | **Case No.: 18-41672** |
| **MGTF RADIO COMPANY, LLC,** ) | **Honorable Charles E. Rendlen III** |
| **WPNT, INC.,** ) | **Chapter 11 Proceeding** |
| ) | **Joint Administration Requested** |
| **Debtors.** ) | |
| ) | **Hearing Date: March 22, 2018** |
| ) | **Hearing Time: 1:00 p.m.** |
| ) | **Hearing Location: 7 South** |
| ) | **St. Louis, Missouri** |
| ) | |
| ) | **Robert E. Eggmann, Esq.** |
| ) | **Thomas H. Riske, Esq.** |
| ) | **Carmody MacDonald P.C.** |
| ) | **120 South Central, Suite 1800** |
| ) | **St. Louis, Missouri 63105** |
| ) | **(314) 854-8600** |
| ) | **ree@carmodymacdonald.com** |
| ) | **thr@carmodymacdonald.com** |

**DECLARATION OF MICHAEL J. FRISCHLING**
**IN SUPPORT OF CERTAIN FIRST DAY MOTIONS AND APPLICATIONS**

Michael J. Frischling, hereby declares under penalty of perjury:

1. I am the Vice President of MGTF Radio Company, LLC and WPNT, Inc. ("**Debtors**"). As the Vice President, I am familiar with the day-to-day operations, business affairs, and books and records of Debtors.

2. On March 20, 2018 ("**Petition Date**"), Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Missouri. Debtors intend to continue in the possession of their properties and the management of their business as Debtors-in-Possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has been established in this Chapter 11 case. In order to enable Debtors to operate effectively and to avoid

the adverse effects of the Chapter 11 filing, Debtors will request various types of relief in "first day" applications and motions filed with the Court.

3. I submit this declaration in support of the first day applications and motions in the above captioned Chapter 11 cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first day motion or application. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion, based upon my experience and knowledge of the Debtors' operations and financial condition or information reported to me in the course of my duties by the Debtors' officers, agents, or employees. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

4. Part I of this declaration describes Debtors' business and the circumstances surrounding the filing of Debtors' Chapter 11 petitions. Part II sets forth the background of the prepetition secured debt, and Part III sets forth the relevant facts in support of Debtors' various first day applications and papers filed concurrently herewith.

## I.   BACKGROUND

5. Debtor MGTF Radio Company, LLC ("MGTF") is a limited liability company organized under the law of the State of Missouri with a registered office in St. Louis, Missouri. Debtor WPNT, Inc. ("WPNT") is a privately held corporation organized under the law of the State of Pennsylvania. The licenses of the Debtors are held by MGTF Media Company, LLC, a Missouri limited liability company wholly owned by MGTF and organized under the law of the State of Missouri with a registered office in St. Louis, Missouri and by WPNT Media Subsidiary, LLC, a Missouri limited liability company wholly owned by WPNT and organized under the law of the State of Missouri with a registered office in St. Louis, Missouri. In addition to the licenses,

Debtors are also owners of a broadcast tower in St. Charles, Missouri that broadcast the signal of KFTK and various cellular companies.

6. The Debtors do business as "Steel City Media". Steel City Media is a family owned business started with the purchase of WPNT-FM in 1984. In 1989, the company bought AM and FM stations in St. Louis (the AM station was sold in 1996 and the FM was sold in 1998). It expanded in 1993 by purchasing a second FM station in Pittsburgh. In 1998, Steel City Media diversified into publishing with the acquisition of the Pittsburgh City Paper. In 2014, it acquired four FM stations in Kansas City which required it to take on lending partners. Steel City Media provided $28,000,000.00 in cash towards the purchase and hired Fifth Third Bank to put together a group of lenders to finance the remaining $80,000,000.00.

7. In 2015, both Kansas City and Pittsburgh experienced dramatic decreases in radio advertising dollars (-7% and -6% respectively). The decrease in radio advertising activity, over $12 mm between the markets, was a major contributor to Steel City Media tripping a performance covenant with the lenders. Steel City Media met with Fifth Third Bank towards the end of 2015 and discussed reworking the covenants based on market conditions. After initial indication that we would move in that direction, Fifth Third decided to move the loan to Special assets.

8. Steel City Media worked with Special Assets on a forbearance agreement which increased our interest rate, added additional principal payments, slightly adjusted the covenants and required us to sell the Pittsburgh City Paper. The City Paper was sold April 1, 2016 and all net proceeds were used to reduce the senior loan. The covenants were not adjusted to reflect the loss of revenue and cash flow, nor the increased costs because of shared expenses.

9. Steel City Media fulfilled all its obligations of the original forbearance agreement. Even though Fifth Third stated they would work with us to get us out of Special Assets if will meet the new covenants, the senior lending group decided we needed to find new lending partners. The new forbearance required us to hire an Investment Banker and meet certain benchmarks for bringing on new lender partners. Steel City Media received term sheets in May 2017 for a refinance. The new lending partners required a Quality of Earnings study, which we completed and were set to close in August. The new junior lender backed out three days before closing; they were concerned about continued radio ad spending declines in the markets.

10. September 2017, Fifth Third required us to stop paying cash interest to the junior lender, switched our interest from LIBOR to Base Rate, and charged an additional default rate penalty. We discussed a potential asset sale as a remedy, and engaged an industry expert to discuss the radio marketplace. The discussion ended when he told Fifth Third it is not a good time to sell and recommended waited 12-18 months.

11. In November 2017, Debtors hired a new investment firm to explore other refinance options. They have worked with Fifth Third to apprise them of our progress. Fifth Third has continued to charge Steel City Media the higher interest rate even though they said we could revert back to LIBOR at the beginning of 2018.

12. Steel City Media has made every principal and interest payment. It also has paid all penalties, legal fees and outside consultant charges imposed by Fifth Third and the Lending Group.

13. With no other alternatives available, the Debtors took the unfortunate, but necessary step, of filing their voluntary petitions to preserve the value of their business and assets. Through the Chapter 11 Cases, the Debtors intends to restructure their debt obligations to

enable it to satisfy the claims of Fifth Third, vendors and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code.

## II. DEBTORS' PRE-PETITION SECURED LENDERS

14. As of the date hereof, Debtors have prepetition indebtedness of approximately $61,500,000.00, including approximately $37,728,000.00 of secured debt (collectively, the "**Secured Debt**").

15. The Debtors' Secured Debt has been paid down significantly in the months prior to the Petition Date such that as the date hereof, $37,000,000.00, plus any applicable interest, fees and expenses, in Secured Debt is outstanding.

16. The Secured Debt is memorialized by that certain Credit Agreement, dated as of September 29, 2014, by and among Debtors, certain lenders ("**Lenders**"), and Fifth Third Bank (the "**Agent**" and "**Credit Agreement**").

17. The debt issued under the Credit Agreement is secured by a first priority security interest in certain assets and real property of the Debtors (the "**Pre-Petition Collateral**").

## III. MOTIONS AND APPLICATIONS

18. An important element of Debtors' successful Chapter 11 cases is approval of each of Debtors' motions and applications submitted concurrently herewith. Factual information in support of such orders is provided below and in the applications and motions filed concurrently herewith.

### Retention of Carmody MacDonald P.C.

19. Continued representation of Debtors by their counsel, Carmody MacDonald P.C. ("CM"), is critical to the success of Debtors' Chapter 11 proceedings because CM is uniquely

familiar with Debtors' business and legal affairs as more fully set forth in the Application for the retention of CM and Declaration of Robert E. Eggmann.

20. Debtors selected the firm of CM as attorneys because of the firm's experience and knowledge in the field of Debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

21. Debtors desires to employ the firm of CM under a general retainer because of the extensive legal services that will be required in connection with the Chapter 11 case.

22. The services of attorneys under a general retainer are necessary in order to enable Debtors to faithfully execute its duties as Debtors in Possession. Subject to further order of this Court, CM will be required to render, among others, the following services to Debtors:

    a. Advising Debtors with respect to their rights, power and duties in this case;

    b. Assisting and advising Debtors in its consultations with any appointed committee relative to the administration of this case;

    c. Assisting Debtors in analyzing the claims of creditors and negotiating with such creditors;

    d. Assisting Debtors with investigation of the assets, liabilities and financial condition of Debtors and reorganizing Debtors' businesses in order to maximize the value of Debtors' assets for the benefit of all creditors;

    e. Advising Debtors in connection with the sale of assets or business;

    f. Assisting Debtors in its analysis of and negotiation with any appointed committee or any third party concerning matters related to, among other things, the terms of a plan of reorganization;

    g. Assisting and advising Debtors with respect to any communications with the general creditor body regarding significant matters in this case;

    h. Commencing and prosecuting necessary and appropriate actions and/or proceedings on behalf of Debtors;

    i. Reviewing, analyzing or preparing, on behalf of Debtors, all necessary applications, motions, answers, orders, reports, schedules, pleadings and other documents;

      j.      Representing Debtors at all hearings and other proceedings;

      k.      Conferring with other professional advisors retained by Debtors in providing advice to Debtors; and

      l.      Performing all other necessary legal services in this case as may be requested by Debtors in these Chapter 11 proceedings; and

      m.      Assisting and advising Debtors regarding pending arbitration and litigation matters in which Debtors may be involved, including continued prosecution or defense of actions and/or negotiations on Debtors' behalf.

23.      The firm of CM has indicated a willingness to act on behalf of Debtors.

24.      To the best of Debtors' knowledge, Robert E. Eggmann, and the other members, counsel, and associates of the firm of CM (i) do not have any connection with Debtors, its affiliates, creditors, or any other parties in interest, or their respective attorneys and accountants, (ii) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code, and (iii) do not hold or represent any interest adverse to the estate, except as set forth herein and in the declaration and statement of Robert E. Eggmann, a partner of CM, filed concurrently herewith.

### Retention of Gordian Broadcast Technologies, LLC

25.      Continued representation of Debtors by their investment banker and financial advisor, Gordian Broadcast Technologies, LLC ("GBT"), is critical to the success of Debtors' Chapter 11 proceedings because of GBT's knowledge, experience, and expertise in the field of financial restructurings and reorganizations under chapter 11 of the Bankruptcy Code and because the Debtors require an investment banker and financial advisor to assist them in performing the tasks associated with fulfilling their objectives in this chapter 11 case.as more fully set forth in the Application for the retention of GBT and Declaration of Peter S. Kaufman.

26.      In providing prepetition services to the Debtors, GBT has worked closely with Debtors' senior management and has gained familiarly with the other major stakeholders that

will be involved in these Chapter 11 cases. As such, GBT has developed relevant experience and expertise regarding the Debtors and their restructuring alternatives such that their employment is necessary to avoid immediate and irreparable harm.

27. Employment of GBT as the Debtors' investment banker and financial advisor is appropriate and necessary to enable the Debtors to maximize the value of their estates for the benefit of the Debtors' stakeholders through a Financial Transaction (as defined in the Engagement Letter). The Debtors anticipate that GBT will provide the following services to it in this chapter 11 case:[1]

> a) Advise and assist the Debtors with the general formulation and evaluation of various options for effecting one or more possible Financial Transactions;
>
> b) Advise and assist the Debtors regarding any potential restructuring, amendment, extension, conversion, exchange, compromise, repayment, retirement, assumption, refinancing or other modification or satisfaction of the Debtors' indebtedness and/or obligations;
>
> c) Advise and assist the Debtors in raising new or replacement debt or equity capital (or other investment or financing) for the Debtors or their affiliates, including identifying and, to the extent agreed by the Debtors, contacting potential parties to any such investment or financing;
>
> d) Advise and assist the Debtors regarding any potential merger or sale of any of the Debtors and their affiliates or their securities, assets or businesses, including identifying and, to the extent agreed by the Debtors, contacting potential parties for any such merger or sale;
>
> e) Assist in preparing, for review and approval by the Debtors, proposals to creditors, equity holders and other parties-in-interest in connection with any possible Financial Transaction;

---

[1] All capitalized terms shall have the meaning ascribed in the Engagement Letter. To the extent there is any conflict between the terms set forth in this Application and the terms set forth in the Engagement Letter, the terms set forth in the Engagement Letter shall govern.

{15323/00000/2223116.DOC.} 8

7441667v2

  f)  Assist with the structuring and implementation of any Financial Transaction, including evaluating proposals from, and participating in negotiations with, third parties regarding such Financial Transaction;

  g)  Assist with making presentations to the Board of Directors regarding any potential Financial Transaction, its participating parties and/or other financial issues related thereto;

  h)  Provide testimony to any bankruptcy court, as appropriate and mutually agreed upon by Gordian and the Debtors; and

  i)  Render such other financial advisory and investment banking services as may be mutually agreed upon by Gordian and the Debtors.

## **Cash Collateral**

28. The Debtors requires the use of Cash Collateral to continue its business operations and to pay its regular daily expenses, including employees' wages, utilities, and its other costs of doing business.

29. The Debtors require Cash Collateral to meet post-petition payroll, to pay necessary business expenses, and to continue its operations.

30. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of its business without the use of the Cash Collateral. The Debtors' ability to preserve its relationship with vendors and suppliers, to pay its employees, and to otherwise finance its operations, is essential to the Debtors' continued viability.

31. Absent the requested relief, the Debtors will be unable to pay their payroll and payroll expenses, operating expenses, and to otherwise operate its business and preserve its assets. Immediate and irreparable harm to the Debtors' business and value of their estates will occur absent the relief requested herein.

32. The terms set forth in the Cash Collateral Motion, including the terms under which the Agent and Lenders will receive certain security interests and claims are fair and reasonable under the circumstances. Thus, the Debtors believe that the entry of an order granting the interim and final relief requested in this Motion is in the best interest of their estates and creditors.

## Business Necessity to Pay Pre-Petition Employee Claims

33. Debtors have requested authority to pay outstanding pre-petition Employee wages and benefits under the *Emergency Motion for Order Authorizing Payment of Pre-Petition Wages, Salaries, Reimbursable Employee Expenses and Medical and Other Employee Benefits* ("**Wage Motion**").

34. Debtors currently employs eighty-six (86) salaried and hourly employees, which include management, office staff, and other necessary staff. All of these employees are on the payroll of, and paid by, Debtors. The majority of employees are paid on a salaried basis with a smaller percentage paid on a hourly basis. Additionally, Debtors employ sales employees who are entitled to receive commissions. All employees will suffer great hardship if they were to lose or suffer any delay in receiving their pay and/or benefits.

35. Failure to pay the pre-petition employee claims (the "**Pre-Petition Employee Claims**") as described and identified in the Wage Motion would cause Debtors' employees to suffer undue hardships and, in many instances, financial difficulties because such amounts are necessary to enable employees to meet their respective personal, household and family obligations. Such a result would obviously destroy employee morale and result in unmanageable employee turnover. The Debtors submit that any significant deterioration in morale at this time will substantially and adversely impact the Debtors and their ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtors and their estates.

36. In addition, the Debtors believe that most, if not all, of the Pre-Petition Employee Claims will be entitled to priority status. Upon my information and belief, no single employee is owed more than $12,850.00 in total Pre-Petition Employee Claims. Thus, these employees will most likely be entitled to seek priority status for their claims under Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

37. To the extent that payment of the amounts described in the Wage Motion may subsequently be determined to be greater than a recipient thereof would otherwise have received if this case was commenced or proceeded under Chapter 7 of the Bankruptcy Code, Debtors (or any subsequently appointed Trustee) expressly reserve the right to seek recovery of such payments.

38. Debtors submit that the amounts to be paid to employees pursuant to the Wage Motion are reasonable compared with the importance and necessity of the services of the employees and the losses Debtors will likely suffer if those amounts are not paid.

39. The requested relief also will reduce significantly the administrative burden which otherwise might be imposed in these Chapter 11 cases. For Debtors to identify whether and to what extent individual employees hold priority or general unsecured claims for employee benefits, and to modify benefit policies to enforce these distinctions, would impose additional burdens of administration and expense which seem unwarranted under the circumstances of these cases.

**Utilities**

40. In connection with the operation of its business, Debtors obtains electricity, water, telephone and other similar services from several utility companies or utility divisions. Any interruption in these services would seriously disrupt Debtors' normal day-to-day operations, thereby causing potentially irreparable harm to the reorganization of Debtors. **Exhibit A** to the

Debtors' *Motion for an Order Pursuant to Sections 105(a) and 366(b) of the Bankruptcy Code (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (II) Deeming Utility Companies Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Utilities Motion**") is a list of all the utility companies that currently provide services to Debtors. The utility companies identified in Exhibit A with respect to their function as providers of utility services shall be referred to as the "**Utilities**."

41. The Utilities service Debtors' facilities. Utility services are essential to Debtors' ability to reorganize.

42. In general, the Debtors have established a good payment history with virtually all of the Utility Companies and have made payments on a regular and timely basis. To the best of the Debtors' knowledge, there are no material defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases.

43. No Utility currently holds a deposit from Debtors.

44. The Debtors believes that the following offer to provide adequate assurance of payment to the Utilities is sufficient to preclude unilateral termination by a utility under 11 U.S.C. § 366(b):

    a. The Debtors shall, on or before twenty (20) days after the Petition Date, deposit a sum of $19,000.00, equal to 50% of the Debtors' estimated monthly cost of the Utility Services, less any deposit already held by any Utility Company (the "Utility Deposit") into a newly created segregated bank account (the "Utility Deposit Account"), with such Utility Deposit to be held in escrow, pending further order of the Court, which shall constitute adequate assurance of payment for each Utility Company for postpetition Utility Services provided to the Debtors. The Utility Deposit Account may be either interest-bearing or non-interest-bearing at the Debtors' election.

      b.      The Utility Deposit Account shall be maintained with a minimum balance of $19,000.00, equal to 50% of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors (i) to account for the termination of Utility Services by the Debtors regardless of any Requests (as defined in the Motion) and/or agreements with Utility Companies, and (ii) in accordance with the terms of any agreement between the Debtors and the affected Utility Company.

      c.      If any Utility Company believes additional Adequate Assurance is required, it may request such additional assurance by serving a written request (a "Request") upon counsel to the Debtors, Carmody MacDonald P.C., 120 S. Central Avenue, Suite 1800, St. Louis, Missouri 63105, Attention: Robert E. Eggmann (e-mail: ree@carmodymacdonald.com); facsimile: (314) 854-8660 (i) setting forth the location(s) for which Utility Services are provided, the account number(s) for such location(s), and the outstanding balance for each account, (ii) providing a report on and certifying the Debtors' payment history on each account for the previous twelve months, (iii) disclosing any existing security deposit and (iv) providing an explanation of why the Utility Deposit is not Adequate Assurance of payment.

      d.      If the Debtors believe a Request is unreasonable, then they shall, within thirty (30) days after receipt of a Request (or such later date agreed to by the Debtors and the requesting party), file a motion (the "Determination Motion") pursuant to section 366(c)(3) of the Bankruptcy Code seeking a determination from the Court that the Utility Deposit, plus any additional consideration offered by the Debtors, constitutes Adequate Assurance of payment.

      e.      Pending notice and a hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse or discontinue services to the Debtors.

      f.      The Utility Deposit shall be deemed Adequate Assurance of payment for any Utility Company that fails to make a Request. Pending resolution of any such Determination Motion, the Utility Company filing such Request shall be prohibited from altering, refusing, or discontinuing service to the Debtors on account of the commencement of the Chapter 11 Cases, unpaid charges for prepetition services or on account of any objections to the Debtors' proposed Adequate Assurance.

45.    Debtors believe that these provisions provide utility companies with "adequate assurance" of payment.

7441667v2                    {15323/00000/2223116.DOC.}          13

46. Debtors will pay all post-petition utility bills when due. If any delay occurs, Debtors believes that the proposed assurances will more than provide sufficient protection to the utility companies providing post-petition services.

Dated: March 21, 2018                    /s/ *Michael J. Frischling*

                                         Michael J. Frischling, Vice President