**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | Case No.: 18-41671-705 |
| | ) | Honorable Charles E. Rendlen III |
| | ) | Chapter 11 |
| **MGTF RADIO COMPANY, LLC, et al.,** | ) | Jointly Administered |
| | ) | |
| **Debtors.** | ) | Hearing Date: December 18, 2018 |
| | ) | Hearing Time: 10:00 a.m. |
| | ) | Hearing Location: 7 South |
| | ) | St. Louis, Missouri |
| | ) | Objection Date: December 11, 2018 |

**Objection of Fifth Third Bank to Debtors' Disclosure Statement Filed November 13, 2018**

COMES NOW Fifth Third Bank, in its capacity as former administrative agent and a former lender (collectively, "**Fifth Third Bank**") under that certain Credit Agreement dated as of September 29, 2014 by and among MGTF Radio Company, LLC, WPNT, Inc., MGTF Paper Company, LLC[1], the Guarantors party thereto, Fifth Third Bank and the other lenders party thereto (Fifth Third Bank as a lender and the other lenders party thereto, collectively, the "**Secured Lenders**") (as modified, amended and supplemented and together with all other documents related thereto, the "**Credit Agreement**")[2] and, by and through its undersigned attorneys, submits this objection (this "**Objection**") to the *Disclosure Statement For Debtors' Joint Plan of Reorganization Dated November 13, 2018* [DKT. No. 143] (the "**Disclosure Statement**")[3] and in support thereof respectfully states as follows:

---

[1] MGTF Paper Company, LLC was sold and released from the Credit Agreement on or about March 31, 2016.

[2] A true and correct copy of the September 29, 2014 Credit Agreement is attached hereto as Exhibit A. Copies of other related Loan Documents (as defined in the Credit Agreement) are available upon request.

[3] Capitalized terms used and not defined herein shall have the meanings ascribed thereto in the Disclosure Statement.

1

**Introduction**

1. Fifth Third Bank hereby objects to the Disclosure Statement because, while the Disclosure Statement indicates that the Debtors or Reorganized Debtors intend to investigate and perhaps prosecute Potential Claims against Fifth Third Bank and the other Secured Lenders under the Credit Agreement, the Disclosure Statement (a) does not provide any information regarding the nature, alleged amounts, likelihood of success or valuation of such Potential Claims, which would be necessary for parties in interest to evaluate the wisdom of using up to $200,000 of estate assets in pursuit of such Potential Claims, (b) fails to disclose to parties in interest that the Debtors owe indemnification obligations to Fifth Third Bank and the other Secured Lenders under the Credit Agreement that would be implicated by the Debtors' investigation and pursuit of such Potential Claims and (c) fails to describe or disclose how the Debtors or Reorganized Debtors intend to satisfy such indemnification obligations to Fifth Third Bank and the other Secured Lenders, which presumably would have to be paid in full in cash pursuant to the provisions of the Debtors' proposed Plan.

**Background**

2. On or about September 29, 2014, WPNT, Inc., MGTF Paper Company, LLC and MGTF Radio Company, LLC, along with certain Guarantors thereunder, entered into the Credit Agreement, pursuant to which the Secured Lenders provided the Debtors with a $60 million term loan facility and a $5 million revolving loan facility, with an original scheduled maturity of September 27, 2019.

3. On or about the same date, the Debtors also borrowed significant unsecured mezzanine financing from Business Development Corporation of American (the "**Mezzanine Lender**"), in the form of term loans in the original principal amount of $20 million (the

"**Mezzanine Debt**").

4.  Unfortunately, the Debtors were unable to perform as anticipated, and by approximately one year later, the Debtors had failed to comply with each of the three primary financial covenants set forth in the Credit Agreement (and with similar financial covenants set forth in the Mezzanine Debt documents) – the Total Leverage Ratio set forth in Section 6.20(a) of the Credit Agreement, the Senior Leverage Ratio set forth in Section 6.20(b) of the Credit Agreement and the Fixed Charge Coverage Ratio set forth in Section 6.20(c) of the Credit Agreement (collectively, the "**Financial Covenants**") – for the Debtors' fiscal quarter ending September 30, 2015.[4]  The Debtors failed to comply with the Financial Covenants for the next fiscal quarter, ending December 31, 2015, as well.[5]

5.  Over the next two-plus years, Fifth Third Bank and the other Secured Lenders worked with the Debtors and with the Mezzanine Lender to give the Debtors time to attempt to find a solution to their difficulties. Fifth Third Bank and the other Secured Lenders entered into four different forbearance agreements with the Debtors during that time – a Forbearance Agreement and First Amendment to Credit Agreement dated as of March 31, 2016 (the "**First Forbearance**"), a Forbearance Agreement and Second Amendment to Credit Agreement dated as of March 7, 2017 (the "**Second Forbearance**"), a Forbearance Agreement dated as of December 8, 2017 (the "**Third Forbearance**") and a Forbearance Agreement and Third Amendment to Credit Agreement dated as of January 29, 2018 (the "**Fourth Forbearance**," and, collectively with the First Forbearance, the Second Forbearance, the Third Forbearance and the

---

[4] *See* Recitals to Forbearance Agreements (as defined below).

[5] The Debtors acknowledged the existence of these Events of Default (as defined in the Credit Agreement), and acknowledged that such Events of Default permitted Fifth Third Bank and the other Secured Lenders to exercise their rights and remedies under the Credit Agreement and the other Loan Documents and under applicable law, in each of the four Forbearance Agreements that the Debtors entered into with Fifth Third Bank and the other Secured Lenders party. *See*, *e.g.*, paragraph 3 of each of the Forbearance Agreements.

3

Fourth Forbearance, the "**Forbearance Agreements**"), copies of which are attached hereto as Exhibits B, C, D and E, respectively.

6. Despite those efforts, and over two years of patience by Fifth Third Bank and the other Secured Lenders while they refrained from exercising remedies against their collateral despite having the right to do so, instead waiting for sufficient improvement in the financial performance of the Debtors, a refinancing of the obligations under the Credit Agreement and perhaps of the Mezzanine Debt as well, a sale of some or all of the Debtors' businesses, or some other option to materialize, the Debtors were unable to effect a solution.

7. In March of 2018, with the Standstill Period under the Fourth Forbearance scheduled to expire on March 19, 2018, Fifth Third Bank and the other Secured Lenders continued to negotiate with the Debtors regarding a possible fifth forbearance agreement. Despite those ongoing negotiations, and without advance notice to or bankruptcy planning with the Secured Lenders, the Debtors elected to file a "free-fall" bankruptcy, and on March 20, 2018 (the "**Petition Date**") filed voluntary petitions for relief under Chapter 11 of the United States Code.

8. As of the Petition Date, the Debtors were indebted to Fifth Third Bank and the other Secured Lenders in an amount equal to approximately $37,728,000.00 "plus any applicable interest, fees and expenses" under the Credit Agreement. *See Declaration of Michael J. Frischling in Support of Certain First Day Motions and Applications* [DKT. No. 7] (the "**First Day Declaration**") at ¶¶ 15, 16.

9. The obligations under the Credit Agreement are secured by a first priority security interest in certain assets and real property of the Debtors. *See* First Day Declaration at ¶ 17.

10. In Section 10.12(b) of the Credit Agreement, the Debtors agreed to indemnify the

4

Administrative Agent and the other Secured Lenders against Damages (as defined in the Credit Agreement and including fees, charges and disbursements of counsel) incurred by the Administrative Agent or any Secured Lender arising out of the execution and delivery of the Credit Agreement and the transactions contemplated thereby, unless such Damages are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent or applicable Secured Lender, or result from a claim brought by any Debtor against Administrative Agent or any Secured Lender for breach in bad faith of such party's obligations under the Credit Agreement or any related document and such Debtor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction (the foregoing, the "**Indemnification Obligations**")[6].

---

[6] The relevant provision of the Credit Agreement provides, in full (capitalized terms used in this paragraph shall have the meanings ascribed to such terms in the Credit Agreement):

> The Borrowers shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender and the L/C Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all Damages (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower or any Guarantor) other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by the L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged violation of Environmental Laws, the presence, Release or threatened Release of Hazardous Materials on or from any property owned or operated by any Borrower or any of its Subsidiaries or at any off-site location for which any Borrower or any of its Subsidiaries may be liable, or any Environmental Claim related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, *provided that* such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee, or (y) result from a claim brought by any Borrower or any Guarantor against an Indemnitee for breach in bad faith of such Indemnitee's obligations

5

11. On or around March 22, 2018 (the "**Transfer Date**"), Fifth Third Bank and the other prepetition Secured Lenders sold their outstanding debt under the Credit Agreement to Business Development Corporation of America – the Debtors' Mezzanine Lender (such sale, the "**Transfer**") – pursuant to that certain Note Purchase and Assumption Agreement dated as of March 22, 2018 (the "**NPA**"). A copy of the NPA, with the purchase price redacted, is attached hereto as Exhibit F.

12. While Fifth Third Bank and the other prepetition Secured Lenders sold their outstanding debt under the Credit Agreement, they retained their rights to indemnification by and reimbursement from the Debtors, and the NPA therefore provided that Fifth Third Bank and the other selling Secured Lenders "shall continue to be entitled to the benefits of any indemnification or reimbursement rights contained in the [Credit Agreement and related documents] with respect to facts and circumstances occurring prior to the Closing Date." *See* NPA at 1.1(c).

13. On April 18, 2018, the Debtors filed their *Schedules and Summary of Assets and Liabilities* [DKT. No. 68] (the "**Schedules**"), in which the Debtors acknowledged the Debtors' obligations under the Credit Agreement, noting that, as of the Petition Date, Fifth Third Bank held a secured claim against the estate in an amount not less than $37,727,998.00 on behalf of the Secured Lenders, secured by "all assets and property of the Debtors" that was not contingent, unliquidated or disputed. *See* Schedules at *Official Form 206D: Creditors Who Have Claims Secured by Property*. The Schedules also acknowledge $24,500,000 owed to the Mezzanine Lender as of the Petition Date. *See* Schedules at *Official Form 206E/F: Creditors Who Have Unsecured Claims*.

---

hereunder or under any other Loan Document, if such Borrower or such Guarantor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

6

14. On April 25, 2018, the Court entered that certain *Final Order Pursuant to 11 U.S.C. §§ 361 and 363 (I) Authorizing the Debtors (A) to Utilize Cash Collateral and (II) Granting Adequate Protection* [DKT. No. 74] (the "**Cash Collateral Order**") in which, among other things, the Debtors acknowledge and agree that "as of the Petition Date, the Debtors are truly and justly indebted … on account of secured debt as set forth in the Credit Agreement in the amount of $37,728,000.00, plus any accrued, unpaid interest and fees, without defenses, counterclaim or offset of any kind." *See* Cash Collateral Order at ¶ I (the foregoing, the "**Debtors' Stipulations**").

15. The Cash Collateral Order further provides that "[t]he Debtors' stipulations, admissions, agreements and releases contained in [the Cash Collateral] Order, including, without limitation, in paragraphs I through L of [the Cash Collateral] Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes." *See* Cash Collateral Order at ¶ 10.

16. Upon expiration of the Challenge Period (as defined in the Cash Collateral Order), the Debtors' Stipulations further become binding on all parties in interest, and the obligations of the Debtors under the Credit Agreement, which include the Indemnification Obligations, then "constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in these Chapter 11 Cases, and any subsequent chapter 7 case(s)." *See* Cash Collateral Order at ¶ 11.

17. On November 13, 2018, the Debtors filed the Plan and the Disclosure Statement.

18. The Plan sets forth the terms and conditions for a consensual reorganization of the Debtors, and proposes to pay holders of allowed unsecured claims in full.

19.     The Disclosure Statement provides, among other things, that the Reorganized Debtors intend to investigate and potentially prosecute certain Potential Claims against Fifth Third Bank and the other Secured Lenders, but fails to provide any information as to the nature, alleged amounts, likelihood of success or valuation of such Potential Claims, and fails to disclose the Debtors' indemnification obligations to Fifth Third Bank and the other Secured Lenders, or how the Debtors or the Reorganized Debtors intend to satisfy their Indemnification Obligations to Fifth Third Bank and the other Secured Lenders in the event that any of them suffer indemnifiable losses under the terms of the Credit Agreement.

**Objection**

20.     Section 1125(b) of the Bankruptcy Code provides that acceptance or rejection of a proposed plan of reorganization may not be solicited unless and until "a written disclosure statement [is] approved, after notice and hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

21.     Courts in this Circuit and others have developed a list of factors which may be necessary to meet the statutory requirement of providing creditors with "adequate information," which includes, among other things, a description of available estate assets and their value, the source of all information contained in the disclosure statement, the scheduled claims, financial information, data, valuations or projections relevant to creditors' decisions to accept or reject the plan and any litigation likely to arise in a nonbankruptcy context. *See In re Puff,* No. BR 10-01877, 2011 WL 2604759, at *3 (Bankr. N.D. Iowa June 30, 2011) (collecting cases). Here, the Debtors have failed to provide adequate information regarding the Potential Claims and regarding the Debtors' Indemnification Obligations to Fifth Third Bank and the other Secured Lenders or the treatment thereof.

22. The Debtors have not disputed their obligations under the Credit Agreement in these Chapter 11 Cases. Indeed, the Debtors have repeatedly acknowledged and recognized that they are bound by their obligations under the Credit Agreement. In their Schedules, the Debtors listed Fifth Third Bank as the holder of a valid, undisputed claim under the Credit Agreement. The Debtors further stipulated to those obligations in the Cash Collateral Order. Pursuant to paragraph 11 of the Cash Collateral Order, the stipulations, admissions and agreements of and releases by the Debtors set forth therein also become binding on all other parties in interest upon expiration of the Challenge Period, and, among other things, "the obligations of the Debtors under the Credit Agreement, including the Secured Debt, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in these Chapter 11 Cases, and any subsequent chapter 7 case(s)."[7]

23. As a result of the Transfer, Fifth Third Bank no longer holds claims against the Debtors for principal or interest arising under the Credit Agreement, but remains a creditor with respect to any Indemnification Obligations that may arise as a result of the Debtors' or the Reorganized Debtors' investigation or pursuit of the Potential Claims or otherwise.

24. Since the Plan proposes to pay unsecured creditors in full, any unsecured claims that arise in favor of Fifth Third Bank and the other Secured Lenders with respect to the Indemnification Obligations will need to be satisfied in full.[8]

25. Assuming, *arguendo*, that the Debtors or Reorganized Debtors are even entitled

---

[7] We further note that the Cash Collateral Order appears to release all claims and causes of action "arising out of or relating to the Credit Agreement," providing that, upon expiration of the Challenge Period, all such claims and causes of action "shall be deemed forever waived, released and barred." *See* Cash Collateral Order at ¶ 11. Notably, the Cash Collateral Order, unlike the Plan, does not specifically carve out the "Former Agent" or "Former Lenders," as they are defined therein, from that release.

[8] Since the Debtors propose to pay all allowed unsecured claims in full in Cash, it is immaterial for purposes of this Objection whether the Indemnification Claims should be treated as administrative or secured or unsecured claims. Fifth Third Bank reserves all rights with respect to (and to object to) the Debtors' characterization, classification or proposed treatment of such Indemnification Claims.

9

under the terms of the Cash Collateral Order to bring the Potential Claims against Fifth Third Bank and the other Secured Lenders, it is beyond question that any damages, losses, costs or expenses suffered by Fifth Third Bank and the other Secured Lenders under the terms and definition of the Credit Agreement must be indemnified by the Debtors (the "**Indemnification Claims**") unless such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the defendants, or result from a claim brought by any Debtor against Fifth Third Bank and the other Secured Lenders for breach in bad faith of their obligations under the Credit Agreement or any related document and has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

26. While the Disclosure Statement gestures at the possibility of Potential Claims, it fails to provide any meaningful description of the nature or alleged amount of such Potential Claims, the likelihood of success of such Potential Claims, or their estimated value to the estate. This is particularly striking given that the Debtors propose to spend $200,000 of estate funds to investigate and potentially prosecute such Potential Claims. The Debtors do not even indicate if they have undertaken any effort to identify, evaluate or value such Potential Claims.

27. The Debtors should be required to provide sufficient information to allow parties in interest to evaluate whether it is worthwhile or wise to spend up to $200,000 to investigate and pursue what are currently unidentified claims against Fifth Third Bank and the other Secured Lenders, particularly in this context where it is difficult to envision what successful claims the Debtors or Reorganized Debtors could possibly bring, given that (among other things) Fifth Third Bank and the other Secured Lenders waited over two years after the Debtors defaulted

under the Credit Agreement without exercising remedies, instead entering into Forbearance Agreements that were negotiated with the Debtors[9], where the Debtors acknowledged the existing defaults and the rights of Fifth Third Bank and the other Secured Lenders in such Forbearance Agreements[10], where the Debtors provided releases to Fifth Third Bank and the other Secured Lenders in each of four Forbearance Agreements[11], and where the Debtors commenced these Chapter 11 Cases not at the urging or insistence of Fifth Third Bank and the other Secured Lenders, but instead voluntarily, on their own, with a surprise "free-fall" filing and no advance notice to Fifth Third Bank or the other Secured Lenders.  Detail about the Potential Claims would also help parties in interest evaluate how and whether spending up to $200,000 to investigate and pursue such Potential Claims could generate a net return to the Debtors' estates, given that even if the Debtors are able to identify some causes of action to pursue against Fifth Third Bank or the other Secured Lenders, the Debtors have provided no information as to what damages the Debtors could possibly be entitled given that the Debtors elected to use the chapter 11 process to effect a restructuring and have now apparently reached agreement on terms for a consensual, successful restructuring.  Based on the information in the Disclosure Statement, it is impossible for parties in interest to determine whether the Debtors' proposal to spend up to $200,000 to investigate and potentially pursue the Potential Claims should be supported.

28.     Furthermore, the Disclosure Statement fails to account for the Indemnification Claims entirely.  It does not disclose the existence of the Indemnification Obligations or describe

---

[9] *See* Forbearance Agreements, *passim.*

[10] *See* paragraph 3 of each of the Forbearance Agreements.

[11] *See* paragraph 14 of the First Forbearance, paragraph 13 of the Second Forbearance, paragraph 12 of the Third Forbearance and paragraph 13 of thee Fourth Forbearance.

11

the proposed treatment of the Indemnification Claims, or note for parties in interest that the potential costs of investigating and pursing Potential Claims of unknown value may not be limited to the $200,000 that the Debtors propose to set aside for such purpose, and that the Debtors may also incur significant Indemnification Claims in the process.

29. The Disclosure Statement should not be approved until the Debtors have provided sufficient information as to the nature and estimated value of the Potential Claims and until the Disclosure Statement describes how the estates plan to satisfy in full the Indemnification Claims if the Debtors or Reorganized Debtors decide to investigate and/or pursue the Potential Claims and fail to obtain a final nonappealable order from a court of competent jurisdiction finding that the Debtor suffered damages that resulted from the gross negligence, willful misconduct or breach in bad faith by Fifth Third Bank or the other Secured Lenders.

## **Reservation of Rights**

30. Fifth Third Bank reserves its rights to further object to any amendments or modifications proposed to the Plan or Disclosure Statement, including based upon any new information provided by Debtors or upon any different relief requested by Debtors. Fifth Third Bank reserves all rights to object to the Plan.

## **Conclusion**

WHEREFORE, Fifth Third Bank respectfully submits that this Court should reject the Disclosure Statement in its current form because it lacks "adequate information" as required by Bankruptcy Code section 1125 for the reasons set forth herein.

Dated: December 11, 2018  
St. Louis, Missouri

Filed By:

*/s/ Matthew S. Layfield*
POLSINELLI P.C.
Matthew S. Layfield, Esq.
100 S. Fourth Street, Suite 1000
St. Louis, MO 63102
Telephone: (314) 889-8000

*Local Counsel for Fifth Third Bank*

CHAPMAN AND CUTLER LLP
Stephen R. Tetro, II, Esq.
111 West Monroe
Chicago, IL 60603
Telephone: (312) 845-3859

*Lead Counsel for Fifth Third Bank*

13