**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re:  #143 | ) | **Case No.:  18-41671-705** |
| | ) | **Honorable Charles E. Rendlen III** |
| **MGTF RADIO COMPANY, LLC, et al.,** | ) | **Chapter 11** |
| | ) | **Jointly Administered** |
| Debtors. | ) | |

## ORDER APPROVING ADEQUACY OF DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION AND GRANTING RELATED RELIEF

Upon consideration of the *Disclosure Statement for Debtors' Joint Plain of Reorganization Dated November 13, 2018* (the "Disclosure Statement" and "Plan"[1] respectively) filed by Debtors and Debtors-in-Possession MGTF Radio Company, LLC and WPNT, Inc. ("Debtors"); and the Court having jurisdiction to consider the Disclosure Statement; and it appearing that proper and adequate notice of the Disclosure Statement has been given; and any objection to the adequacy of the information contained therein having been withdrawn or overruled on the merits; and the Court having determined that the relief sought in the Disclosure Statement is in the best interest of the Debtors, their creditors, and all parties-in-interest; and after due deliberation thereon and good and sufficient cause appearing therefor;

**IT IS ORDERED:**

1.    The Disclosure Statement, attached hereto as Schedule 1, is approved as providing Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.  All objections to approval of the Disclosure Statement are hereby overruled.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Disclosure Statement and Plan.

2.      The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

3.      The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan.

4.      The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept, and voting on, the Plan as well as filing objections to the Plan and confirming the Plan (all times prevailing Central Time):

| Event | Date |
|---|---|
| Solicitation Deadline | Seven (7) Business Days from the Entry of this Order |
| Deadline to File Plan Supplement | January 22, 2019 at 4:00 p.m. |
| Voting Deadline | January 29, 2019 at 4:00 p.m. |
| Plan Objection Deadline | January 29, 2019 at 4:00 p.m. |
| Deadline to File Confirmation Brief | February 5, 2019 at 4:00 p.m. |
| Deadline to File Voting Report | February 5, 2019 at 4:00 p.m. |
| Deadline for Receipt of Opt-Out Certifications | February 12, 2019 at 9:00 a.m. |
| Confirmation Hearing Date | February 12, 2019 at 10:00 a.m. |

5.      In addition to the Disclosure Statement and exhibits thereto, the Plan, and this Order, the solicitation packages (the "Solicitation Packages") to be transmitted on or before the Solicitation Deadline to those Holders of Claims in the Classes entitled to vote on the Plan shall include an appropriate form of Ballot and a Notice of the Confirmation Hearing Date. Holders

of Unimpaired Claims Conclusively Presumed to Accept the Plan shall receive as part of their Solicitation Packages a copy of the Notice of Non-Voting Status for Unimpaired Classes Conclusively Presumed to Accept the Plan with a form Opt-Out Provision of the Releases provided in the Plan and a Notice of the Confirmation Hearing Date.

6.      The Solicitation Packages provide the Holders of Claims with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Bankruptcy Rules.

7.      The Debtors shall distribute the Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline.  Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

8.      The Debtors reserved the right to modify the Plan in accordance with Article VII thereof.

9.      Nothing in this Order shall be construed as a waiver of the right of the Debtors to object to any proof of claim.

10.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective upon its entry.

11.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

DATED:  December 28, 2018
St. Louis, Missouri 63102
mtc

CHARLES E. RENDLEN, III
U.S. Bankruptcy Judge

<u>Order Prepared By:</u>
Robert E. Eggmann
Thomas H. Riske
Carmody MacDonald, P.C.
120 South Central, Suite 1800
St. Louis, Missouri 63105
(314) 854-8600
(314) 854-8660 - Fax

Copies to:

United States Trustee's Office
111 South Tenth Street, Suite 6353
St. Louis, MO 63102

Robert E. Eggmann
Attorney for Debtors
Carmody MacDonald P.C.
120 South Central Avenue, Suite 1800
St. Louis, MO 63105

MGTF Radio Company, LLC
7701 Forsyth, Suite 500
St. Louis, MO 63105

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Case No.:  18-41671-705** |
| | ) | **Honorable Charles E. Rendlen III** |
| **MGTF RADIO COMPANY, LLC, et al.,** | ) | **Chapter 11** |
| | ) | **Jointly Administered** |
| **Debtors.** | ) | |
| | ) | **Hearing Date: December 18, 2018** |
| | ) | **Hearing Time:  10:00 a.m.** |
| | ) | **Hearing Location: 7 South** |
| | ) | **St. Louis, Missouri** |
| | ) | |
| | ) | **Robert E. Eggmann, Esq.** |
| | ) | **Thomas H. Riske, Esq.** |
| | ) | **Carmody MacDonald P.C.** |
| | ) | **120 South Central, Suite 1800** |
| | ) | **St. Louis, Missouri 63105** |
| | ) | **(314) 854-8600** |
| | ) | **ree@carmodymacdonald.com** |
| | ) | **thr@carmodymacdonald.com** |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN OF REORGANIZATION**
**DATED NOVEMBER 13, 2018**

This Disclosure Statement for the Debtors' Joint Plan of Reorganization Dated November 13, 2018 (the "Plan") has been prepared and is being distributed by MGTF Radio Company, LLC and WPNT, Inc., the Debtors in these Chapter 11 Cases (the "Debtors" or "Plan Proponents").

**ARTICLE I**
**INTRODUCTION**

1.1    <u>Purpose</u>.  The Debtors are providing this Disclosure Statement (the "Disclosure Statement") to all of Debtors' known creditors and to the shareholders of the Debtors pursuant to the provision of § 1125 of the United States Bankruptcy Code (the "Bankruptcy Code"), in order to enable such creditors and shareholders to make an informed judgment concerning Debtors' solicitation of acceptances of the Plan described below, prior to certain of such creditors and shareholders exercising their rights to vote to accept or reject the Plan.   A hearing to determine

the adequacy of this Disclosure Statement was held on December 18 at 10:00 a.m. Central Standard Time in the United States Bankruptcy Court for the Eastern District of Missouri, Thomas Eagleton U.S. Courthouse, 111 South 10th Street, St. Louis, Missouri 63102.  At the hearing, the Court determined whether this Disclosure Statement contains "adequate information" (as defined in §1125 of the Bankruptcy Code) of a kind and in sufficient detail to enable a hypothetical, reasonable investor, typical of the holders of claims against or shareholder interests in Debtors to make an informed judgment in voting to accept or reject the Plan. Approval of this Disclosure Statement by the Court, however, does not constitute a recommendation by the Court to accept or reject the Plan.

      1.2    <u>Construction</u>.  **The definitions in the Plan are applicable here.**  Insofar as not inconsistent or in conflict with such definitions, the words herein will have the meanings ascribed thereto by the Bankruptcy Code and the Bankruptcy Rules.

      1.3    <u>Source of Information</u>.  Except as otherwise expressly stated herein, this Disclosure Statement has been prepared by counsel for the Debtors based upon information supplied by the Debtors.

      1.4    <u>Disclaimers</u>.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE LEGAL EFFECTS OF THE REORGANIZATION OF DEBTORS ON HOLDERS OF CLAIMS.

EXCEPT AS MAY BE SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE COURT, NO REPRESENTATIONS CONCERNING DEBTORS, THE CONSEQUENCES OF THE PLAN, OR THE VALUE OF DEBTORS' ASSETS ARE AUTHORIZED BY THE COURT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN BY CREDITORS THAT ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE DOCUMENT APPROVED FOR DISTRIBUTION BY THE COURT SHOULD NOT BE RELIED UPON IN VOTING ON THE PLAN AND SHOULD BE REPORTED TO THE DEBTORS' COUNSEL AND THE OFFICE OF THE UNITED STATES TRUSTEE.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THIS DISCLOSURE STATEMENT SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THIS DISCLOSURE STATEMENT WAS COMPILED.

THERE HAS BEEN NO AUDIT OR REVIEW OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT BY OR ON BEHALF OF THE DEBTORS AND THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. CREDITORS ARE ENCOURAGED TO REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT WITH LEGAL COUNSEL.

READING THIS DISCLOSURE STATEMENT IS NOT A SUBSTITUTE FOR READING THE PLAN, WHICH WILL CONTROL THE LEGAL RELATIONSHIPS BETWEEN THE PARTIES FOLLOWING CONFIRMATION. THE DISCLOSURE STATEMENT ATTEMPTS TO SUMMARIZE THE PLAN, AND IN THE EVENT OF ANY DISCREPANCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE PLAN WILL GOVERN.

## ARTICLE II

## <u>CONFIRMATION PROCEDURES</u>

2.1     <u>Confirmation</u>.  The Plan cannot be consummated unless it is confirmed by the Court.  Confirmation of the Plan requires that, among other things, either (i) each class of claims that is impaired by the Plan has voted to accept the Plan by the requisite majority, or (ii) the Plan is determined by the Court to be fair and equitable, as defined by the Bankruptcy Code, with respect to all classes of claims that have rejected the Plan. The Bankruptcy Code also requires that the confirmation of the Plan be in the "best interest" of all creditors. The Plan Proponents believe that the Plan meets the classification requirements of the Bankruptcy Code, which requires that all claims or interest in a class be "substantially similar".  Disputes regarding a proper classification of claims or interests not specifically classified in the Plan will be resolved by the Court pursuant to the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and other applicable law, and such resolution will not be a condition precedent to confirmation or consummation of the Plan.

2.2     <u>Creditors Eligible to Vote</u>.  Only the votes of classes whose claims are impaired by the Plan will be counted in connection with the confirmation of the Plan.  Generally, and subject to the specific provisions of §1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable or contractual rights attaching to the claims or of the class are modified, other than by curing default in stated maturities.  Creditors in Class 2, Class 4 and Class 7 are, for purposes of this Disclosure Statement, deemed to be impaired under the Plan and accordingly, are entitled to vote to accept or reject the Plan.  In determining acceptances of the Plan, votes will be counted only if timely submitted by a holder of an Allowed Claim.

2.3     Acceptances Necessary to Confirm the Plan.   For the Plan to be accepted and, thereafter, confirmed, it must be accepted by at least one class of claims that is impaired by the Plan.  Under § 1126 of the Bankruptcy Code, an impaired class is deemed to have accepted the Plan if (i) with respect to a class of claims, votes representing at least two-thirds in amount and more than one-half in number of allowed claims that have voted in that class have accepted the Plan, and (ii) with respect to a class of equity interests, votes representing at least two-thirds in amount of those interests that have voted have accepted the Plan, provided that the vote of any creditor or holder of an interest that is determined by the Court to be an entity whose acceptance or rejection was not in good faith will not be counted.

Unless an impaired class accepts the Plan unanimously, to confirm the Plan the Court must independently determine that the Plan provides to each holder of a claim or interest, as the case may be, of such class, a recovery that has a value, as of the Effective Date, at least equal to the value of the distribution which such holder would receive or retain if Debtors were instead liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

2.4     Manner of Voting.   In voting for or against the Plan, please use only the ballots sent to you with this Disclosure Statement.   If a person has an Allowed Claim in more than one class, such person may receive multiple ballots. Each person will be entitled to vote each claim that such person holds in each class.

Creditors who are entitled to vote to accept or reject the Plan may vote by completing, dating, signing and mailing, or faxing, the accompanying ballot to counsel for the Plan Proponent in care of:

Robert E. Eggmann, Esq.
Thomas H. Riske, Esq.
CARMODY MACDONALD, P.C.
120 South Central Ave., Suite 1800

St. Louis, Missouri  63105
Facsimile:  (314) 854-8660
ree@carmodymacdonald.com
thr@carmodymacdonald.com

In order for a ballot to be counted, the ballot must be received on or before **5:00 p.m.,**
**Central Standard Time, on _____, 2018**.  A ballot, once submitted, cannot be
withdrawn or modified except as provided under the Bankruptcy Code.

2.5    <u>Confirmation Without Acceptance</u>.  Section 1129(b) of the Bankruptcy Code
provides that the Plan may be confirmed by the Court despite not being accepted by every
impaired class if (i) at least one impaired class has accepted the Plan, and (ii) the Court finds that
the Plan does not discriminate unfairly and is fair and equitable to the rejecting classes. Among
other things, such a finding would require a determination by the Court that the Plan would
require that no holder of an allowed claim junior to a rejecting unsecured class receive or retain
any property or payment under the Plan, unless such rejecting unsecured class is being paid an
amount equal to the value of its claims as of the effective date of the Plan.

Pursuant to §1129(b) of the Bankruptcy Code, the Debtors will request the Court to
confirm the Plan if all of the applicable requirements of §1129(a) of the Bankruptcy Code, other
than §1129(a)(8) (that each impaired class under the proposed Plan has voted to accept the Plan),
have been met.   In addition, the Debtors reserve the right, pursuant to §1126(e) of the
Bankruptcy Code to request the Court to strike any rejection of the Plan by any holder of a claim
or interest as not being in good faith.

2.6    <u>Hearing on Confirmation of Plan</u>.    A hearing has been scheduled for
_____, 2018 at 10:00 a.m., Central Standard Time, in the United States Bankruptcy
Court for the Eastern District of Missouri, Thomas Eagleton US Courthouse, 111 South 10th
Street, St. Louis, Missouri 63102, Courtroom 7 South, to determine whether the Plan has been

accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied. This hearing may be adjourned from time to time without further written notice. Each creditor will receive, either with this Disclosure Statement or separately, the Court's notice of hearing on confirmation of the Plan.

2.7     Effect of Confirmation. The Confirmation Order will be a judicial determination that the holders of claims and interests, following confirmation, will be precluded from asserting against the Debtors any claim or interest based upon any pre-petition debt or obligation.

**ARTICLE III**
**GENERAL INFORMATION**

3.1     The Debtors. Debtor MGTF Radio Company, LLC ("MGTF") is a limited liability company organized under the law of the State of Missouri with a registered office in St. Louis, Missouri. Debtor WPNT, Inc. ("WPNT") is a privately held corporation organized under the law of the State of Pennsylvania. The licenses of the Debtors are held by MGTF Media Company, LLC, a Missouri limited liability company wholly owned by MGTF and organized under the law of the State of Missouri with a registered office in St. Louis, Missouri and by WPNT Media Subsidiary, LLC, a Missouri limited liability company wholly owned by WPNT and organized under the law of the State of Missouri with a registered office in St. Louis, Missouri. In addition to the licenses, Debtors are also owners of a broadcast tower in St. Charles, Missouri that broadcasts the signal of an unaffiliated radio station and various cellular companies.

The Debtors do business as "Steel City Media". Steel City Media is a family owned business started with the purchase of WLTJ(FM) (formerly known as "WPNT-FM") in 1984. In 1989, Steel City Media bought AM and FM stations in St. Louis (the AM station was sold in 1996 and the FM was sold in 1998). It expanded in 1993 by purchasing a second FM station in

Pittsburgh.  In 1998, Steel City Media diversified into publishing with the acquisition of the *Pittsburgh City Paper*.  In 2014, it acquired four FM stations in Kansas City, which required it to take on lending partners.  Steel City Media provided $28,000,000.00 in cash towards the purchase of the four FM stations in Kansas City and hired Fifth Third Bank to put together a group of lenders to finance the remaining $80,000,000.00.

In 2015, both Kansas City and Pittsburgh experienced dramatic decreases in radio advertising dollars (-7% and -6% respectively).  The decrease in radio advertising activity, over $12 million between the markets, was a major contributor to Steel City Media allegedly violating a performance covenant with its lenders.  Steel City Media met with Fifth Third Bank towards the end of 2015 and discussed renegotiating the covenants based on market conditions.  After initial indications that Fifth Third Bank would renegotiate, it ultimately decided to move the loan to its Special Assets group ("Special Assets").

Steel City Media continued to negotiate with Special Assets on a forbearance agreement which increased the interest rate, added additional principal payments, slightly adjusted the covenants, and required Steel City Media to sell the *Pittsburgh City Paper*.  The *Pittsburgh City Paper* was sold April 1, 2016 and all net proceeds were used to reduce the senior loan.  The covenants were not adjusted to reflect the loss of revenue and cash flow, nor the increased costs because of shared expenses.

Steel City Media fulfilled all its obligations under the original forbearance agreement.  Even though Fifth Third Bank stated it would work with Steel City Media to get the company out of Special Assets if Steel City Media complied with the new covenants, the senior lending group decided Steel City Media needed to find new lending partners.  The new forbearance agreement required Steel City Media to hire an investment banker and meet certain benchmarks

for bringing on new lender partners.  Steel City Media received refinancing term sheets in May

2017.  The new lending partners required a Quality of Earnings study, which Steel City Media

completed and was set to close in August 2017.  The new junior lender backed out three days

before closing due to concerns about continued radio advertisement spending declines in the

markets.

In September 2017, Fifth Third Bank required Steel City Media to stop paying cash

interest to the junior lender, switched the company's interest rate from LIBOR to Base Rate, and

charged an additional default rate penalty.  Steel City Media discussed a potential asset sale as a

remedy and engaged an industry expert to discuss the radio marketplace.  The discussion ended

when the expert advised Fifth Third Bank against an asset sale at that time.

In November 2017, Steel City Media hired a new investment firm to explore other

refinance options.  This firm worked with Fifth Third Bank to apprise them of Steel City

Media's progress.  Fifth Third Bank continued to charge Steel City Media the higher interest rate

despite its prior promises that the interest rate would revert back to LIBOR at the beginning of

2018.

Steel City Media made every principal and interest payment to Fifth Third Bank.  Steel

City Media also has paid all penalties, legal fees, and outside consultant charges imposed by

Fifth Third Bank and its lending group.

Steel City Media's pursuit of a refinancing failed to yield any proposal that would satisfy

its debt in full in the time made available by its senior lenders.  The owners of the Debtors'

mezzanine debt under that certain Subordinated Credit Agreement dated as of September 29,

2014, Business Development Corporation of America ("BDCA"), acquired from Fifth Third

Bank the senior secured debt issued under that certain Credit Agreement dated as of September

29, 2014.  BSP Agency, LLC ("BSP Agency") now serves as administrative agent under both facilities.

With no other alternatives available, Steel City Media took the unfortunate, but necessary step, of filing the Debtors' voluntary petitions to preserve the value of their business and assets. Through the Chapter 11 Cases, the Debtors intended to restructure their debt obligations to enable them to satisfy the claims of their secured lenders, vendors, and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code.

The pre-petition consolidation of the Debtors' funded indebtedness allowed for efficient negotiations in the Chapter 11 Cases.  After meaningful, arm's-length negotiations, the Debtors, the Holders of Existing Equity Interests, and BSP Agency, on September 13, 2018, reached a deal as provided for in that certain plan term sheet circulated on that date ("Plan Term Sheet"), upon which the Plan is predicated.

3.2     The Chapter 11 Cases.  Debtors have managed their financial affairs and taken steps to place themselves in a position to reorganize their business debts pursuant to the terms of the Plan.

During the course of the Chapter 11 Cases, Debtors filed numerous "first day" motions that sought relief to maintain their ordinary course business operations throughout the Chapter 11 Cases, including seeking the retention of professionals, including their current legal counsel, Carmody MacDonald P.C. ("Carmody") and financial advisor Gordian Broadcast Technologies, LLC ("Gordian").  The Bankruptcy Court granted the relief requested in the Debtors' motions. Thereafter, the Debtors attended the initial Debtors' interview, prepared and filed their Schedules and monthly operating reports and attended the § 341 meeting of creditors.

No adversary proceedings have been filed in the Debtors' case and no Trustee or Official Committee for Unsecured Creditors was appointed.

After months of arms-length negotiations with their Lenders, the Debtors are now in a position to propose a Chapter 11 Plan of Reorganization that has the support of their senior and junior lender constituencies (*i.e.*, BSP Agency and BDCA) that Debtors also believe to be in the best interest of their estates.

3.3  <u>Post-Petition Operations</u>. Throughout the Chapter 11 Cases, the Debtors have managed to continue their post-petition operations without disruption and comply with their adequate protection obligations to their Lenders while maintaining substantial cash account balances. Please review the Debtors' most recent Monthly Operating Reports attached hereto as **Exhibit A**.

3.4  <u>Title 28 U.S.C. § 1930 Fees</u>.  All fees paid in the Chapter 11 Cases, pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Code at the hearing on confirmation of the Plan or thereafter, will, if not previously paid in full, be paid in cash on the Effective Date.  All post-confirmation reports and fees as required by law shall be filed and paid.

3.5  <u>Debtors' Post-Petition Professional Fees</u>.  Debtors' post-petition professional fees outstanding on the Effective Date consist of fees and expenses of attorneys and expenses incurred after the Petition Date.  Professionals must file an Application for Compensation with the Bankruptcy Court pursuant to §§ 330 and 331 of the Bankruptcy Code, or § 328 to the extent so approved by the Bankruptcy Court.

3.6  <u>Projected Recovery of Avoidance Actions.</u>  The Reorganized Debtors do not intend to pursue preferences, fraudulent transfers or other avoidance actions.  Based upon an analysis of the Statement of Financial Affairs, any preferential transfer actions and fraudulent

transfer actions against any Creditor, Debtors or any Insiders, of which Debtors believe there to be none, shall be released upon entry of the Confirmation Order (the "Release").

3.7    Plan Reflects Consensual Arrangement.  The Plan is based upon a consensual arrangement and global compromise, as reflected in the Plan Term Sheet, to effect a restructuring while avoiding the costs and delays associated with litigation, including litigation concerning the Debtors' enterprise value.

## ARTICLE IV
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Under the Plan, claims and equity interests will be classified and paid as follows:

4.01    Administrative Claims and Expenses.  As required by the Bankruptcy Code, Allowed Administrative Claims are not classified under the Plan.  The holder of an Allowed Claim of the kind described in §507(a)(1) of the Bankruptcy Code, including, but not limited to, an Allowed Claim entitled to payment under §503(b), shall be paid in cash on the Effective Date or the obligations under any agreements shall be performed in the ordinary course of business in accordance with the terms and conditions of any such controlling agreements, course of dealing, course of business, or industry practice.  The Administrative Claims outstanding on the Effective Date will consist of fees and expenses of professionals for post-filing work, any post-petition taxes, and other administrative claims.

4.02    Priority Tax Claims.  As required by the Bankruptcy Code, Allowed Priority Tax Claims are not classified under the Plan. Each holder of an Allowed Claim of the kind described in §507(a)(8) of the Bankruptcy Code will receive payment of its claim in equal quarterly installments so that each Claim will be paid within five years of the Petition Date.  Said payment will include interest at the rate of 4% per annum, or such other rate as may be applicable and allowed by law.  Debtors submit that the Allowed Priority Tax Claims consist of the following:

| Creditor | Type of Tax | Amount |
|----------|-------------|--------|
| Internal Revenue Service | WPNT Income | $100.00 |

4.03    <u>Class 1 Allowed Priority Non-Tax Claims:</u>  Class 1 shall consist of the Allowed Priority Non-Tax Claims. Class 1 is not Impaired under the Plan.

4.04    <u>Class 2 Allowed Senior Secured Claims:</u>  Class 2 shall consist of the Allowed Senior Secured Claims.  Class 2 is Impaired under the Plan.

4.05    <u>Class 3 Allowed Other Secured Claims.</u>  Class 3 shall consist of the Allowed Other Secured Claims.  Class 3 is not Impaired under the Plan.

4.06    <u>Class 4 Allowed</u> Unsecured Mezzanine Loan Claims.  Class 4 shall consist of the Allowed Unsecured Notes Claims.  Class 4 is Impaired under the Plan.

4.07    <u>Class 5 Allowed Other General Unsecured Claims</u>.  Class 5 shall consist of all Allowed Other General Unsecured Claims.  Class 5 is not Impaired under the Plan.

4.08    <u>Class 6 Allowed Intercompany Claims</u>. Class 6 shall consist of all Allowed Intercompany Claims.  Class 6 is not Impaired under the Plan.

4.09    <u>Class 7 Allowed Existing Equity Interests</u>. Class 7 consists of all Allowed Existing Equity Interests in the Debtors.  Class 7 is Impaired under the Plan.

4.10    <u>Treatment of Disputed Claims.</u>  Notwithstanding any other provisions of the Plan, payments and distributions of cash with respect to any class of claims which are disputed, unliquidated, or contingent, will not be made until such claims are allowed.  Notwithstanding any provision in the Plan to the contrary, the Claim of any transferee of a transfer that is voidable under §§ 544, 548 and 550 of the Bankruptcy Code will be deemed to be a Disputed Claim, and no distribution will be payable thereon, unless and until such transferee has paid the amount, or turned over any such property, for which such transferee is liable under §550 of the Bankruptcy Code.

4.11   Plan Treatment Summary.   The Plan divides Allowed Claims and Allowed Interests against the Debtors into various Classes, which the Debtors believe are in accordance with the Classification requirements of the Bankruptcy Code. The term "Allowed Claim" is defined in Section 1.02 of the Plan.  Distributions to the holders of Allowed Claims under the Plan are in full satisfaction of those Allowed Claims (including any interest accrued and allowable thereon).  The treatment of Classified Allowed Claims and Allowed Interests under the Plan is set forth below.

**Summary of Treatment of Allowed Claims and Interests**

| Class | Claim/Interest | Treatment | Estimated Allowed Amount (as of October 31, 2018 | Estimated Recovery | Entitled to Vote |
|---|---|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | $0 | 100% | No (deemed to accept) |
| Class 2 | Senior Secured Claims | Impaired | $37,995,536.61 | 100% | Yes |
| Class 3 | Other Secured Claims | Unimpaired | To Be Determined | 100% | No (deemed to accept) |
| Class 4 | Unsecured Mezzanine Loan Claims | Impaired | $24,717,429.53 | 100% | Yes |
| Class 5 | Other General Unsecured Claims | Unimpaired | $500,000.00 | 100% | No (deemed to accept) |
| Class 6 | Intercompany Claims | Unimpaired | N/A | 100% | No (deemed to accept) |
| Class 7 | Existing Equity Interest | Impaired | N/A | 67%[1] | Yes |

4.12   **Class 1 Allowed Priority Non-Tax Claims**

Debtors' employees and independent contractors were paid prior to the filing and do not hold Priority Non-Tax Claims.  Debtors are not aware of any unpaid Class 1 Claims. In the event that Priority Non-Tax Claims are filed and Allowed in the Chapter 11 Cases and remain unpaid on the Effective Date, such Claims will be treated as provided herein.

(a)     Treatment: Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim and/or to the extent that such Priority Non-Tax Claim has been paid in full on or before the Effective Date, the holder of such Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Claim on the Effective Date.

Debtors estimate that the monthly distribution on account of Class 1 Priority Non-Tax Claims is $0.00.

(b)     Voting: The Allowed Priority Non-Tax Claims are not Impaired, and the holders of such Claims, if any, are not entitled to vote to accept or reject the Plan on account of such Claim.

4.13     **Class 2 Allowed Senior Secured Claims**

(a)     Treatment: Treatment: The Senior Secured Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of $37,995,536.61, plus all unpaid accrued interest, fees and other charges owing under the Senior Credit Agreement to the extent not already reflected in the foregoing figure and subject to reduction to the extent the Debtors make a

---

[1] On the Effective Date, the New Holdcos will retain 67% of the equity in the respective Reorganized Debtors, with

payment in respect of the Senior Credit Agreement from excess cash prior to the Effective Date.  The Holder of the Senior Secured Claims will retain all adequate protection payments in full and final satisfaction of any and all Adequate Protection Claims, and, on or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of each Senior Secured Claim, will receive: (a) a Pro Rata share of the New Term Loan, in accordance with the Plan Term Sheet; (b) the New Equity in accordance with the Equity Allocation Mechanism as provided for in the Plan Term Sheet; (c) the Additional Equity in accordance with the Equity Allocation Mechanism as provided for in the Plan Term Sheet, and (d) a Cash Distribution equal to the amount of: (i) accrued and unpaid interest under the Senior Credit Agreement; (ii) unpaid amounts in respect of hedging obligations and interest thereon under the Senior Credit Agreement; and (iii) accrued and unpaid fees and expenses. Any Adequate Protection Claims which are outstanding as of the Effective Date shall be paid in cash on the Effective Date.

(b)      Voting: Senior Secured Claims are Impaired, and the Holders thereof are entitled to vote on the Plan.

4.14     **Class 3 Allowed Other Secured Claims**

(a)      Treatment: Except to the extent that a Holder of an Other Secured Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other

Secured Claim, each holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (ii) the Allowed Other Secured Claim will be reinstated pursuant to section 1124 of the Bankruptcy Code; or (iii) the Other Secured Claims shall retain their liens securing their Claims and  the Debtors and the Reorganized Debtors shall make Distributions to the Holders of the Other Secured Claims pursuant to section 1129(b)(2) of the Bankruptcy Code.

(b)     Voting:  Other Allowed Secured Claims are not Impaired, and the Holders thereof are not entitled to vote on the Plan.

### 4.15   Class 4 Allowed Unsecured Mezzanine Loan Claims

(a)     Treatment: The Allowed Unsecured Mezzanine Loan Claims shall be Allowed and deemed to be Allowed Claims in the aggregate amount of $24,717,429.53, plus prepetition interest, fees and other charges owing under the Subordinated Credit Agreement to the extent not already reflected in the foregoing figure.   In exchange for full and final satisfaction, settlement, release and discharge of each Allowed Unsecured Mezzanine Loan Claim, the Holders of Allowed Unsecured Mezzanine Loan Claims will receive: (a) a Pro Rata share of the New Term Loan; (b) New Equity in accordance with the Equity Allocation Mechanism as

provided for in the Plan Term Sheet; and (c) Additional Equity in accordance with the Equity Allocation Mechanism as provided for in the Plan Term Sheet.

(b)     Voting:  All Allowed Unsecured Mezzanine Loan Claims are Impaired, and each Holder thereof is entitled to vote on the Plan.

4.16   **Class 5 Allowed General Unsecured Claims**

(a)     Treatment: General Unsecured Claims are not secured by Estate Property and are not entitled to priority under Bankruptcy Code § 507(a). The holders of Other Allowed General Unsecured Claims shall receive Cash in an amount equal to such Claim on the Effective Date.

(b)     Voting:  All Allowed Other General Unsecured Claims are not Impaired, and each Holder thereof are not entitled to vote on the Plan.

4.17   **Class 6 Allowed Intercompany Claims**

(a)     Treatment: Class 6 consists of all Allowed Intercompany Claims in the Debtors.  Class 6 claimants will not receive any distribution under the Plan. Upon the Effective Date, all Intercompany Claims will be reinstated in full.  Notwithstanding the foregoing, on and after the Effective Date, the Reorganized Debtors shall be entitled, with the Consent of the New Term Loan Agent, to transfer funds and obligations between and among

themselves, and to release Intercompany Claims, as they determine to be necessary or appropriate to best enable the Reorganized Debtors to satisfy their obligations under the Plan.

(b)    Voting:  Class 6 Claims are not Impaired, and the holders thereof are not entitled to vote under the Plan.

4.18    **Class 7 Allowed Existing Equity Interests**

(a)    Treatment: Class 7 consists of all Allowed Existing Equity Interests in the Debtors.  Upon the Effective Date, the existing stock of the Debtors shall be transferred to the New Holdcos in accordance, and to implement the transactions contemplated by, the Plan Term Sheet.  On or as soon as practicable after the Effective Date, each Existing Equity Holder shall retain 100% of the equity in the respective New Holdcos, and an indirect 67% equity interest in the Reorganized Debtors, in accordance with the Equity Allocation Mechanism, as provided for in the Plan Term Sheet.

(b)    Voting: Class 7 is Impaired and entitled to vote under the Plan.

**ARTICLE V**
**PROVISIONS FOR THE ASSUMPTION AND**
**REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

5.01    Assumption of Executory Contracts and Unexpired Leases and Proposed Cure. No later than twenty-one (21) days prior to the Confirmation Hearing, the Debtors, with the Consent of the Senior Agent, shall file with the Bankruptcy Court a schedule (the "Assumed Executory Contracts and Unexpired Leases Schedule") identifying those Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan, provided that the Debtors reserve the

right to amend the Assumed Executory Contracts and Unexpired Leases Schedule at any time up to three (3) Business Days prior to the Confirmation Hearing to add or delete any Executory Contracts and Unexpired Leases contained therein. The Debtors shall provide notice of the Assumed Executory Contracts and Unexpired Leases Schedule, and any amendments thereto, to the non-Debtor parties to the Executory Contracts and Unexpired Leases. The Assumed Executory Contracts and Unexpired Leases Schedule shall include a designation of the monetary cure amount that Debtors believe is owed with respect to each Executory Contract and Unexpired Leases set forth.  Except as provided elsewhere in the Plan, any non-Debtor party to an Executory Contract or Unexpired Lease shall file with the Bankruptcy Court and serve its objection to the Assumed Executory Contracts and Unexpired Leases Schedule and the proposed Cure Amount therein, if any, in writing not later than 5:00 p.m. on the day that is seven (7) days prior to the confirmation hearing.  The failure of any non-Debtor party to an Executory Contract and Unexpired Lease to file and serve an objection to the assumption of such Executory Contract or Unexpired Lease by the deadline therefore shall be deemed as consent to the assumption and assumption and assignment of the Executory Contract and Unexpired Lease and to such cure amount.  On the Effective Date, in addition to all Executory Contracts and Unexpired Leases that have been previously assumed by the Debtors by order of this Court, each of the Executory Contracts and Unexpired Leases of the Debtors that are identified in the Assumed Executory Contracts and Unexpired Leases Schedule shall be deemed assumed and assigned in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of adequate assurance of the future performance of such assumed contract.

     5.02    <u>Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.</u>   The cure amount owed under each Executory Contract and Unexpired Lease to be assumed and

assigned pursuant to the Plan, as set forth in the Assumed Executory Contracts and Unexpired

Leases Schedule, or as otherwise established by the Bankruptcy Court at the Confirmation

Hearing, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of

the cure amount with respect to the aggregate cure costs for the Executory Contracts and

Unexpired Leases listed in the Assumed Executory Contracts and Unexpired Leases Schedule on

the later of (a) the Effective Date (or as soon as practicable thereafter), (b) as due in the ordinary

course of business, or (c) on such other terms as the parties to such Executory Contracts and

Unexpired Leases may otherwise agree or as otherwise established by the Bankruptcy Court at

the confirmation hearing.  In the event the Debtors or Reorganized Debtors are unable to agree

on a cure amount for any Executory Contract or Unexpired Lease, the Debtors or Reorganized

Debtors, as applicable, reserve the right to amend the Assumed Executory Contracts and

Unexpired Leases Schedule, and such Executory Contract or Unexpired Lease shall be deemed

rejected.

       5.03   <u>Post-petition Contracts and Leases.</u>   All contracts and leases entered into by the

Debtors after the Petition Date and remaining in effect on the Effective Date shall be deemed

assigned to the Reorganized Debtors as of the Effective Date.

**ARTICLE VI**
**<u>MEANS FOR IMPLEMENTATION OF THE PLAN</u>**

       6.01   <u>Revesting of Property of the Estate.</u>  On the Effective Date, all Estate Property,

including Avoidance Actions, will vest in the Reorganized Debtors and shall be free and clear of

all claims and interests of Creditors and Parties in Interest, except as expressly provided in the

Plan or the Confirmation Order. On and after the Effective Date, except as provided for in the

Plan, and subject to the Communications Laws, each Reorganized Debtor may operate its

business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court.

6.02    <u>Source of Funding of Plan Distributions</u>.  All consideration necessary for the Reorganized Debtors to make payments or distributions under the Plan shall be obtained from the New Term Loan, the issuance of the New Equity, and from Cash on hand (including Cash from business operations). Further, the Debtors and the Reorganized Debtors shall be entitled to transfer funds, other assets and liabilities between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes to intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

6.03    <u>Corporate Existence</u>.  **Except as otherwise provided herein, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, or other form, as the case may be, with all the powers of a corporation, limited liability company, or other form, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect on the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).**

6.04    <u>Reorganization Transfer and New Equity</u>.  On the Effective Date, all Existing Equity Interests (including common stock, preferred stock, and any options, warrants, profit

interest units, or rights to acquire any equity interests) in Debtor WPNT, Inc. shall be transferred to a newly formed holding company, owned by the Existing Equity Holders ("WPNT Holdco, Inc."). WPNT Holdco, Inc. shall establish a new wholly-owned limited liability corporation ("WPNT, LLC"). Debtor WPNT Inc. shall merge into WPNT, LLC with WPNT, LLC surviving ("Reorganized Debtor WPNT"). Pursuant to the Plan, the Existing Equity Holders will retain 100% of the equity interests in WPNT Holdco, Inc., and an indirect 67% in Reorganized Debtor WPNT, and New Equity in Reorganized Debtor WPNT shall be issued to the Lenders and allocated in accordance with the Equity Allocation Mechanism, as provided for in the Plan Term Sheet.

On the Effective Date, all Existing Equity Interests (including common stock, preferred stock, and any options, warrants, profit interest units, or rights to acquire any equity interests) in Debtor MGTF shall be transferred to a newly formed holding company, owned by the Existing Equity Holders ("MGTF Holdco, LLC"). Pursuant to the Plan, the Existing Equity Holders will retain 100% of the equity interests in MGTF Holdco, LLC, and an indirect 67% in Reorganized Debtor MGTF, and New Equity in Reorganized Debtor MGTF shall be issued to the Lender and allocated in accordance with the Equity Allocation Mechanism, as provided for in the Plan Term Sheet.

Entry of the Confirmation Order shall be deemed approval of the Equity Distribution (including the transactions contemplated thereby, any amendments thereto, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors, the New Holdcos, and the Existing Equity Holders in connection therewith, whether before or after the Effective Date) and authorization for the Reorganized Debtors to issue the New Equity and the Additional Equity, subject to such modifications as the Reorganized Debtors and the New

Term Loan Agent together may deem to be reasonably necessary or advisable in furtherance of the Plan.

Pursuant to section 1145 of the Bankruptcy Code, the issuance by the Reorganized Debtors of the New Equity and the issuance of any notes or promissory notes to evidence indebtedness under the New Term Loan Agreement (to the extent issued and deemed a security) ("Term Loan Notes") as contemplated by the Plan shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state or local law requiring registration prior to the offering, issuance, distribution or sale of New Equity or Term Loan Notes.   The transfer of the New Equity may be restricted by the Communications Laws, including with respect to limitations set forth in Section 6.05 below, the organizational documents for the Reorganized Debtors, the New Term Loan Agreement, and the terms thereof.

6.05    FCC Licenses.  The required FCC Applications, including the FCC Long Form Application and, to the extent deemed necessary by the Debtors, Reorganized Debtors, and Senior Agent, the Petition for Declaratory Ruling, shall be filed by the Debtors as promptly as practicable.  After such filings are made, any Person who thereafter acquires a Senior Secured Claim or Unsecured Mezzanine Loan Claims may, to the extent deemed necessary by the Debtors, Reorganized Debtors, and Senior Agent, be issued special warrants in lieu of, and providing the economic equivalent of, any New Equity that would otherwise be issued to such Person under the Plan, provided that the issuance of each such special warrants is in compliance with the Communications Laws.  In addition, the Debtors may, with the Consent of the Senior Agent, request that the Bankruptcy Court implement restrictions on trading of Claims and Interests that might adversely affect the FCC Approval process. To the extent that the Debtors, Reorganized Debtors and Senior Agent deem it necessary to file a Petition for Declaratory

Ruling, the Debtors shall request that the FCC process the FCC Long Form Applications separate and apart from the Petition for Declaratory Ruling. Regardless of whether the FCC consents to the request for separate processing, the Debtors shall diligently prosecute the FCC Applications and shall promptly provide such additional documents or information reasonably requested by the FCC in connection with its review of the FCC Applications. In the event either FCC Approval is obtained while any such Petition for Declaratory Ruling remains pending, the Debtors (or Reorganized Debtors, as applicable) shall continue to diligently prosecute the Petition for Declaratory Ruling.

6.06    Certain FCC Considerations. The Company's operations are subject to significant regulation by the FCC under the Communications Laws. A radio station may not legally operate in the United States without the authorization of the FCC. Prior approval of the FCC is required for the issuance, renewal, transfer, assignment or modification of station operating licenses. The following is important information concerning the FCC Approval process and the ownership requirements and restrictions that must be met in order for parties to hold New Equity. THE FOLLOWING SUMMARY OF CERTAIN COMMUNICATIONS LAWS IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN ADVISORS AS TO COMMUNICATIONS LAWS RELATING TO OWNERSHIP AND OTHER CONSEQUENCES OF THE PLAN.

(a)    Required FCC Consents. Both the Debtors' entry into Chapter 11 and the Reorganized Debtors' emergence from Chapter 11 require the FCC's consent. Following the Debtors' filing of the voluntary petition under Chapter 11, the Debtors filed applications seeking

the FCC's consent to the *pro forma* transfer of control of the FCC Licenses and Assets that the Debtors control from the Debtors to the Debtors as "debtors in possession" under Chapter 11. The FCC granted those applications on May 14, 2018.  For the Reorganized Debtors to continue the operation of the radio stations that the Debtors control, the Debtors will be required to file the FCC Long Form Applications and to obtain the FCC's prior approval of the contemplated distribution of New Equity contemplated by the Plan.

(b) Information Required from Prospective Stockholders of Reorganized Debtors.  In processing applications, the FCC considers, among other things, whether the prospective licensee and those considered to be "parties" to the applications possess the legal, character and other qualifications to hold an interest in a broadcast station.  For the FCC to process and grant the Long Form Applications, the Debtors will need to obtain and include information about Reorganized Debtors and about the "parties" to the applications demonstrating that such parties are so qualified.  As described in the Plan, Holders of Allowed Senior Secured Claims and Unsecured Mezzanine Loan Claims will be issued New Equity, subject to certain conditions, and shall provide such information as required to obtain FCC Approval, including providing information on the prospective stockholder to establish that issuance of the New Equity would not result in a violation of law, impair the qualifications of the Reorganized Debtors (or their affiliates) to hold the FCC Licenses or impede the grant of any FCC Applications on behalf of the Reorganized Debtors.

All prospective stockholders, whether or not they would be "parties" to the FCC Applications (as described below), would need to provide information on the extent of their direct and indirect ownership or control by non-U.S. Persons to establish that Reorganized Debtors would comply with limitations under the Communications Laws relating to the ownership and control of broadcast licenses by non-U.S. Persons.  Prospective holders of New

Equity with direct or indirect ownership or control by non-U.S. Persons would not be permitted to receive New Equity if the ownership of such prospective holders, including ownership aggregated with the ownership percentage of all other prospective holders, as calculated in accordance with the Communications Laws, would result in Reorganized Debtors having a greater amount of foreign ownership than permitted by the Communications Laws, unless the FCC granted a Petition for Declaratory Ruling.

For purposes of the Plan, the prospective stockholders shall use commercially reasonable efforts to provide such information necessary to enable the Debtors, or the Reorganized Debtors, with the Consent of the Senior Agent or the New Term Loan Agent, as applicable, to determine (x) the extent to which direct and indirect voting and equity interests of the certifying party are held by non.-U.S. Persons, as determined under the Communications Laws, and (y) whether the holding of equity in the Reorganized Debtors by the certifying party would result in a violation of the Communications Laws or be inconsistent with the FCC Approval.

(c) <u>Attributable Interests in Broadcast Properties Under the Communications Laws.</u>  A prospective stockholder in the Reorganized Debtors would be considered a "party" to any FCC Long Form Application if the prospective stockholder would be deemed to hold an "attributable" interest in the Reorganized Debtors under 47 C.F.R. § 73.3555.  The FCC's "multiple ownership" rules prohibit common ownership of "attributable interests" of certain combinations of broadcast properties.  "Attributable interests" generally include the following interests in a broadcasting company: general partnership interests, non-insulated limited liability company or limited partnership interests, a position as an officer or director (or the right to appoint officers or directors), or a 5% or greater direct or indirect interest in voting stock of a corporation.  The FCC treats all partnership interests as attributable, except for those limited partnership interests that are "insulated" by the terms of the limited partnership agreement from "material involvement" in

the broadcast-related activities of the partnership. The FCC treats limited liability companies in the same manner as limited partnerships.  Attribution traces through chains of ownership.  In general, a Person that has an attributable interest in another Person also will be deemed to hold each of that Person's attributable broadcast interests, except for indirect stock interests that are attenuated below the attribution threshold in the ownership chain.

Combinations of direct and indirect equity and debt interests exceeding 33% of the total asset value (equity plus debt) of a broadcast outlet also may be deemed attributable if the holder has another attributable broadcast interest in the same market or provides more than 15% of a station's total weekly broadcast programming hours in that market.  Also, a Person that provides more than 15% of the total weekly programming hours for a radio station and also has an attributable interest in another radio station in the same market is deemed to hold an attributable interest in the programmed station.

(d) <u>FCC Foreign Ownership Restrictions for Entities Controlling Broadcast Licenses</u>. The Communications Laws restrict foreign ownership or control of any Person licensed to provide broadcast and certain other services.  Among other prohibitions, foreign Persons may not have direct or indirect ownership or voting rights of more than 25% in a corporation controlling the licensee of a radio broadcast station if the FCC finds that the public interest will be served by the refusal or revocation of such a license due to foreign ownership or voting rights.  The FCC has interpreted this provision to mean that it must make an affirmative public interest finding before a broadcast license may be granted or transferred to a corporation that is controlled by a foreign Person that is more than 25% owned or controlled, directly or indirectly, by foreigners. The FCC calculates the voting rights separately from equity ownership, and both thresholds must be met.  Warrants and other future interests typically are not taken into account in determining foreign ownership compliance.  In some specific circumstances, however, the FCC has treated

non-stock interests in a corporation as the equivalent of equity ownership and has assessed foreign ownership based on contributions to capital. Foreign ownership limitations also apply to partnerships and limited liability companies.  The FCC historically has treated partnerships with foreign partners as foreign controlled if there are any foreign general partners.  The interests of any foreign limited partners or members of limited liability companies that are not insulated (using FCC criteria) from material involvement in the partnership's or limited liability company's broadcast activities and business are considered in determining the equity ownership and voting rights held by foreigners.  The FCC will attribute a 100% voting interest to non-insulated limited partners and members of limited liability companies.  The voting interests of limited partners and members of limited liability companies that are properly insulated are treated as being the same as amount of equity held.

Because direct and indirect ownership of the Reorganized Debtors' equity by non-U.S. Persons will proportionally affect the level of deemed foreign ownership and control rights in the Reorganized Debtors, prospective shareholders will be required to provide information to the Debtors on their own foreign ownership and control.  The Debtors, in consultation with the New Term Loan Lenders, shall review such information to assess whether permitting such party to hold such interests could impair the qualifications of the Reorganized Debtors to hold the FCC Licenses and Assets absent the grant by the FCC of a Petition for Declaratory Ruling.  Upon receipt of the FCC Approvals, and satisfaction of other Conditions to Effective Date, the New Equity will be distributed as set forth in the Plan.

(e) <u>Local Radio Ownership Restrictions.</u>  The FCC generally applies its ownership limits to "attributable" broadcasting interests held by an individual, corporation, partnership, limited liability company, or other association, as addressed above.  The Communications Laws on local radio ownership-limit the number of commercial radio stations in a particular geographic area in

which a Person can have an attributable interest.  Those laws could give rise to a prohibited combination for the Reorganized Debtors or for a prospective holder of New Equity of the Reorganized Debtors, as described below.

In Kansas City and Pittsburgh, where there are at least 30 commercial stations, one Person can hold an attributable interest in up to seven commercial radio stations, no more than four of which can be in the same service (AM or FM).  If there are 45 or more commercial stations in such market, then one Person may hold an attributable interest in up to eight commercial radio stations, no more than five of which can be in the same service (AM or FM).

6.07   <u>Certain Risk Factors</u>.  THE IMPLEMENTATION OF THE PLAN AND THE ISSUANCE OF THE NEW EQUITY ARE SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW. IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN. THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS." THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN,

THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, AND THE EFFECT OF THE FILING OF THE CHAPTER 11 CASES ON CUSTOMERS, SUPPLIERS, VENDORS AND EMPLOYEES, THE DEGREE AND NATURE OF COMPETITION, DEMAND FOR THE DEBTORS' PRODUCTS, THE DEGREE OF SUCCESS ACHIEVED BY THE DEBTORS' NEW PRODUCT INITIATIVES, INCREASES IN INSURANCE COSTS, CHANGES IN GOVERNMENT REGULATIONS, THE APPLICATION OR INTERPRETATION OF THOSE REGULATIONS OR IN THE SYSTEMS, PERSONNEL, TECHNOLOGIES OR OTHER RESOURCES THE COMPANY DEVOTES TO COMPLIANCE WITH REGULATIONS, THE COMPANY'S ABILITY TO COMPLETE ACQUISITIONS AND SUCCESSFULLY INTEGRATE THE OPERATIONS OF ACQUIRED BUSINESSES, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTORS OR THE REORGANIZED DEBTORS, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

The primary risks under the Plan are that the income from the Reorganized Debtors' business operations will not meet current projections and will be insufficient to fund the Reorganized Debtors' and the New Holdcos' obligations under the Plan. In such case, Reorganized Debtors anticipate that they will reduce expenses, where possible, to meet their

obligations under the Plan.  In addition, the Debtors operate in a highly competitive industry.  In order to stay competitive, the Reorganized Debtors will have to respond to changes in technology, services and standards that characterize the Reorganized Debtors' industry.  The Debtors believe that the continued efforts, abilities, and expertise of the Reorganized Debtors' officers will be essential to the ability to execute the Reorganized Debtors' business strategy. Additional discussion of these and certain other risks follows.

### A. GENERAL BANKRUPTCY LAW CONSIDERATIONS

<u>1. Failure to Obtain Confirmation of the Plan May Result in Liquidation or Confirmation of an Alternative Plan on Less Favorable Terms</u>

Although the Debtors believe that the solicitation procedures utilized for the solicitation of votes with respect to the Plan complied with applicable non-bankruptcy law or the Bankruptcy Code and that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court were to find that the Debtors' solicitation of votes did not comply with the Bankruptcy Code or applicable non-bankruptcy law, if any, all acceptances received pursuant to the solicitation could be deemed invalid and the Debtors could be forced to resolicit acceptances under section 1125(b) of the Bankruptcy Code, in which case confirmation of the Plan could be delayed and possibly jeopardized. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the resolicitation of votes on the Plan. The Plan provides that the Debtors reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent necessary. While the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes

that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from Chapter 11 or prevent confirmation of the Plan. If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into Chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against and Interests in the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

2. Failure of Occurrence of the Effective Date May Result in Liquidation or Alternative Plan on Less Favorable Terms

Although the Debtors believe that the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Effective Date is also subject to certain conditions precedent as described in section 7.11 of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated. The Debtors cannot assure you that all of the conditions to the Effective Date will be satisfied or waived. If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests provided for in the Plan shall be null and void without further order of the Bankruptcy Court; and (c) the time within which the Debtors may assume and assign or reject all executory contracts and unexpired leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated. If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into Chapter 7 liquidation cases or that any alternative plan or

plans of reorganization would be on terms as favorable to the Holders of Claims against and

Interests in the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of

the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern

value would be eroded to the detriment of all stakeholders.

### B. OTHER RISK FACTORS

1. Variances from Projections May Affect Ability to Pay Obligations and the Value of the

Membership Units

The Debtors have prepared the projected financial information contained in **Exhibit C** to

this Disclosure Statement relating to the Reorganized Debtors. The Projections are intended to

illustrate the estimated effects of the Plan and certain related transactions on the results of

operations, cash flow and financial position of the Reorganized Debtors for the periods indicated.

The Projections assume that all aspects of the Plan will be successfully implemented on the

terms set forth in the Plan and this Disclosure Statement. The failure of the Plan to be

successfully implemented could have a materially detrimental effect on the Reorganized

Debtors' business, results of operations and financial condition. Accordingly, actual results may

vary materially from those shown in the Projections, which may adversely affect (a) the ability of

the Reorganized Debtors to pay the obligations owing to certain Holders of Claims entitled to

distributions under the Plan and other indebtedness incurred after confirmation of the Plan; and

(b) the value of the New Equity. Moreover, the Projections were not prepared with a view toward

public disclosure or with a view toward complying with the guidelines established by the

American Institute of Certified Public Accountants with respect to prospective financial

information. The Reorganized Debtors do not undertake any obligation to update or otherwise

revise the Projections to reflect events or circumstances existing or arising after the Effective

Date. The Projections should not be regarded as a representation, guaranty or other assurance by the Debtors, the Reorganized Debtors or any other person that the Projections will be achieved.

2. Extent of Leverage May Limit Ability to Obtain Additional Financing for Operations

The Reorganized Debtors' and New Holdcos' obligations under the New Term Loan will be secured by substantially all of the assets of the Reorganized Debtors and the New Holdcos. The amount of indebtedness owed by the Reorganized Debtors and New Holdcos after the Effective Date may limit the ability of the Reorganized Debtors to obtain additional financing for working capital, capital expenditures, debt service requirements, acquisitions and general corporate or other purposes. Such levels of indebtedness may also limit the ability of the Reorganized Debtors to adjust to changing market conditions and to withstand competitive pressures, possibly leaving the Reorganized Debtors vulnerable in a downturn in general economic conditions or in its business, or unable to carry out capital spending that is important to growth and productivity improvement programs.

3. Risks Associated with the New Term Loan

In the event that the Reorganized Debtors or New Holdcos default under the terms of the New Term Loan, there is a risk that the New Term Loan Lenders could seek to enforce their rights under the New Term Loan.

4. Assumptions Regarding Value of the Debtors' Assets May Prove Incorrect

It has been generally assumed in the preparation of the Projections that the historical book value of the Debtors' assets approximates those assets' fair value, except for specific adjustments. For financial reporting purposes, the fair value of the Debtors' assets must be determined as of the Effective Date. This determination will be based on an independent valuation. Although the Debtors do not presently expect this valuation to result in values that are

materially greater or less than the values assumed in the preparation of the Projections, the Debtors can make no assurances with respect thereto.

5. Historical Financial Information May Not Be Comparable

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

6. Market and Business Risks May Adversely Affect Business Performance

In the normal course of business, the Debtors are subject to the following types of risks and variables, which the Debtors anticipate may materially affect their business performance following the Effective Date:

- General economic and business conditions;

- The degree and nature of competition in the Debtors' markets;

- Fluctuations in advertising demand from the Debtors' customers;

- The degree of success achieved by the Debtors in any new initiatives;

- Changes in government regulations, the application or interpretation of those regulations or in the systems, personnel, technologies or other resources the Debtors devote to compliance with regulations;

- The Debtors' ability to complete acquisitions and successfully integrate the operations of acquired businesses; and

- The Debtors' ability to obtain cash adequate to fund its needs, including the borrowings available under the New Term Loan.

## C. RISKS TO CREDITORS AND INTEREST HOLDERS WHO WILL RECEIVE NEW EQUITY

The ultimate recoveries under the Plan to Holders of Claims in Classes 2 and 4 and Interests in Class 7 that receive New Equity pursuant to the Plan will depend on the realizable value of the New Equity. The New Equity to be issued pursuant to the Plan is subject to a number of material risks, including, but not limited to, those specified herein. Prior to voting on the Plan, each Holder of Claims in Classes 2 and 4 and Interests in 7 should carefully consider the risk factors specified or referred to herein, as well as all of the information contained in the Plan and this Disclosure Statement.

1. Lack of Established Market for the New Equity May Adversely Affect Liquidity.

The New Equity will be illiquid securities without a trading market. The Debtors and the Reorganized Debtors do not anticipate that the New Equity to be issued under the Plan will be listed on or traded on any nationally recognized market or exchange. Further, the New Equity to be issued under the Plan will not be registered under the Securities Act of 1933 (as amended, together with the rules and regulations promulgated thereunder, the "Securities Act"), any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Equity may be offered or sold only in transactions that are not subject to or that are exempt from the registration requirements of the Securities Act and other applicable securities laws, and in compliance with the operating agreements or other applicable corporate documents with respect to the Reorganized Debtors.

2. Lack of Dividends on New Equity May Adversely Affect Liquidity

The Debtors do not anticipate that cash dividends or other distributions will be made by the Reorganized Debtors with respect to the New Equity in the foreseeable future, other than as set for in the operating agreements or other applicable corporate documents with respect to the

Reorganized Debtors.  In addition, covenants in certain debt instruments to which the Reorganized Debtors will be a party may restrict the ability of the Reorganized Debtors to pay dividends and make certain other payments.  Further, such restrictions on dividends may have an adverse impact on the market demand for New Equity as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

6.08    Treatment of Disputed Claims.  Notwithstanding any other provisions of the Plan, Distributions with respect to any Claim which is disputed, unliquidated, or contingent will not be made until such Claim becomes an Allowed Claim.  Notwithstanding any provision in the Plan to the contrary, the Claim of any transferee of a transfer that is voidable §§ 544, 548 and 550 of the Bankruptcy Code will be deemed to be a Disputed Claim, and no Distribution will be made thereon, unless and until such transferee has paid the amount, or turned over any such property, for which such transferee is liable under §550 of the Bankruptcy Code.

6.09    Deadline to Dispute Claims.  The Reorganized Debtors, with the Consent of the New Term Loan Agent, shall file, within ninety (90) days of the Effective Date, objections to Claims.  Subject to the provisions of the Plan, upon entry of a Final Order resolving the objection, the Reorganized Debtors shall commence Distributions to the Claimant.

6.10    Distributions to Holders of Allowed Claims.  Distributions shall be mailed, via first class mail, to the Creditor's address listed on the proof of claim or such other address as provided by the Creditor before the Distribution is mailed.

**6.11    Unclaimed Distributions.  All Distributions which remain uncashed for sixty (60) days shall be void and deemed forfeited.  The Reorganized Debtors shall not be liable for or obligated to pay any forfeited Distributions.**

6.12    Preservation of Causes of Action.  In accordance with §1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  Unless any Causes of Action are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the Effective Date.

The Reorganized Debtors intend to investigate potential claims against Fifth Third Bank, as administrative agent under the Senior Credit Agreement, and prior holders of the debt evidenced by the Senior Credit Agreement, which for the avoidance of doubt does not include BSP Agency or BDCA ("Potential Claims").  The Reorganized Debtors will apply 100% of any net recoveries from such claims to pay down the New Term Loan; provided, that, (x) the Reorganized Debtors shall only be entitled to spend up to $200,000 in fees and expenses in connection with investigating or prosecuting Potential Claims, provided, that the Reorganized Debtors may pledge portions of the proceeds of Potential Claims to attorneys that agree to pursue the Potential Claims on a contingency basis; and (y) it being understood that the Lenders shall be indemnified by the Reorganized Debtors and the New Holdcos for any claims that may arise from the prosecution of the Potential Claims under the credit agreement for the New Term Loan.

## ARTICLE VII
## GENERAL PROVISIONS

7.1     <u>Retention of Jurisdiction</u>.  Until the Plan is fully implemented and this case is

closed, the Bankruptcy Court will retain jurisdiction to ensure that the purposes and intent of the

Plan are carried out, and to hear and determine all claims against the Debtors or on behalf of the

Debtors.  The Court will retain jurisdiction over these Chapter 11 Cases for the purpose of ruling

on any matter to come properly before this Court, including, but not limited to, determining any

matters for which approval of the Bankruptcy Court has been provided by the Plan or any other

matters pertaining to the Plan or the Confirmation Order and determining all disputes, suits or

controversies arising out of the Plan and its interpretation, enforcement or consummation,

including any disputes relating to the new organizational documents governing the Reorganized

Debtors or the New Holdcos and all ancillary and related documents relative to the Plan and

these Chapter 11 Cases, including the Existing Equity Holders Undertaking.

7.2     <u>Defect or Inconsistency in Plan</u>.  After confirmation of the Plan, so long as it does

not materially or adversely affect the interests of the creditors, the Bankruptcy Court upon

motion of any party in interest may remedy any defect or inconsistency in the Plan as may be

necessary to carry out the purposes and effects of the Plan.

7.3     <u>Effect of Confirmation</u>.  On the Effective Date, all provisions of the Plan, and all

amendments, exhibits and schedules thereto, will become binding on the Debtors, the Estate, all

Creditors, and all other entities whose interests are affected in any way by the Plan.  On the

Effective Date, all Property of the Estate will be vested in the Reorganized Debtors, and will be

free and clear of all claims and interests of Creditors and Parties in Interest, except as expressly

provided in the Plan or the Confirmation Order.  The automatic stay provision of §362 of the

Bankruptcy Code will remain in full force and effect until the Chapter 11 Cases are closed.

7.4    Severability.  Any clause within the Plan, enforcement of which is determined to be unconstitutional, illegal, unlawful, or otherwise improper or against public policy, will be severed and stricken from the Plan and will not invalidate or otherwise render void the remainder of the Plan unless such severance would frustrate the accomplishment of the purposes of the Plan.

7.5    Tax Consequences.

The following discussion is a summary of certain United States federal income tax aspects of the Plan.  It is for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), final, temporary, and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan.

The United States federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  No ruling has been requested or obtained from the Internal Revenue Service (the "IRS") with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein.  No

representations or assurances are being made to the Holders of Claims or Interests with respect to the United States federal income tax consequences described herein.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (I) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE IRC; (II) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (III) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.   ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

7.6     <u>Plan Securities</u>.  The Plan provides for the Reorganized Debtors to distribute New Equity to Holders of Senior Secured Claims and Holders of Unsecured Mezzanine Loan Claims, and permits the issuance of Term Loan Notes.  Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable Blue Sky Law) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor: and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in exchange and partly for cash and property.  In reliance upon these exemptions, the offer and sale of the New Equity and any Term Loan Notes (to the extent deemed securities) will not be registered under the Securities Act or any applicable state Blue Sky Law.

Because the issuance of the New Equity and any Term Loan Notes (to the extent deemed securities) are covered by section 1145 of the Bankruptcy Code, the New Equity and any Term Loan Notes may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 1145 of the Bankruptcy Code.  In addition, the New Equity and any Term Loan Notes (to the extent deemed securities) governed by section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Recipients of the New Equity and any Term Loan Notes are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to the Plan Securities and any other potential exemption from

registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a

plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Under certain circumstances, holders of New Equity or any Term Loan Notes (to the extent deemed securities) who are deemed to be "underwriters" may be entitled to resell their New Equity and any Term Loan Notes pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Equity and any Term Loan Notes would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Equity and any Term Loan Notes and, in turn, whether any Person may freely resell New Equity or such Term Loan Notes. The Debtors recommend that potential recipients New Equity or any Term Loan Notes consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

### ARTICLE VIII
### CONFIRMATION STANDARDS

The Court will confirm the Plan at the Confirmation Hearing only if all the requirements of section 1129 of the Bankruptcy Code are met.  Those requirements include:

8.1    <u>Best Interest Test</u>.  With respect to each impaired Class, each claimant or interest holder in such Class either (i) has accepted the Plan, or (ii) will receive or retain under the Plan on account of its claim or interest, property of a value, as of the Effective Date, that is at least equal to the amount which such claimant or interest holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  More specifically, if the Plan provides that each claimant or interest holder in a class will receive money or other consideration equal to or in excess of the probable dividend it would receive if all of the Debtor's property were immediately liquidated, then the Plan is in the "best interests" of such claimant or interest holder.

8.2    <u>Feasibility Test</u>.  The Bankruptcy Code requires a judicial determination that Confirmation of the Plan will not likely be followed by liquidation or the need for further reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  Based upon the post-petition operating history and financial projections, the Debtors' ongoing operational plan is feasible.  The Debtors have operated as Chapter 11 debtors since March 20, 2018 and made their adequate protection payments to their lenders.  The proposed reorganization plan provides the Debtors working capital and is similar to the framework under which the Debtors have operated in Chapter 11 and as a result feasibility of the Debtors' operations has been tested.  Financial Projections (the "Projections") are set forth and attached hereto as **Exhibit C**.  Based upon the Projections, the Debtors believe that the Reorganized Debtors will have viable operations following the Effective Date and that the Plan will meet the feasibility requirements of the Bankruptcy Code.[22]

---

[22]   The Projections were prepared by the Debtors and/or the Debtors' advisors, and BSP Agency has not endorsed the Projections.

8.3     Valuation.     The Plan is based upon a consensual arrangement among the Lenders

and the Debtors to effect a restructuring while avoiding the costs and delays associated with

litigation, including litigation concerning the Debtors' enterprise value.

8.4     Acceptance.     Each impaired Class must accept the Plan by the percentages

described in paragraph 2.3, above, or the Court must find that the Plan complies with the "fair

and equitable" test described below with respect to any such non-accepting Class.

8.5     Fair and Equitable Test.     If less than all the Impaired Classes accept the Plan, the

Plan may nevertheless be confirmed by the Court under section 1129(b) of the Bankruptcy Code

as long as one impaired Class has affirmatively voted to accept the Plan.   In order to obtain

Confirmation pursuant to section 1129(b) of the Bankruptcy Code, the Plan Proponent must

demonstrate to the Court that as to each non-accepting Class, the Plan "does not discriminate

unfairly" and is "fair and equitable with respect to that Class."   As a general rule, a Plan does not

discriminate unfairly if a dissenting Class receives relative value equal to the value given to all

other similarly situated classes and does not bear disproportionate risk.   In addition, the

Bankruptcy Code establishes different "fair and equitable" tests for non-accepting secured

creditors, unsecured creditors and interest holders as follows:

1.     Secured Creditors.   A non-accepting secured creditor whose Claim is impaired,

must retain the lien(s) securing its claim and receive under the Plan cash payments that have a

present value at least equal to such creditor's Allowed Secured Claim, or otherwise receive the

"indubitable equivalent" of the value of the interest in the Debtors' property upon which it holds

a lien.

2.     Unsecured Creditors.   A non-accepting unsecured creditor whose Claim is

impaired must receive or retain under the Plan (a) property of a value at least equal to the amount

of its Allowed Claims; or (b) the holders of Claims or Interests junior to the Claims of the non-accepting Class of Unsecured Creditors will not receive or retain any property under the Plan.

3.     <u>Interest Holders</u>.   A non-accepting interest holder must receive and retain under the Plan, property of a value equal to (a) the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of the interest; or (b) the holders of interests junior to the Class will not receive or retain any property under the Plan on account of such junior interest.

The Plan Proponents believe that the Plan does not discriminate unfairly and satisfies the "fair and equitable" test.

**ARTICLE IX**
**EFFECT OF CONFIRMATION OF THE PLAN**

9.1     <u>Terms Binding</u>.   On the Effective Date, all provisions of the Plan, and all amendments, exhibits and schedules thereto, shall become binding on the Reorganized Debtors, the New Holdcos, the Estate, all Creditors, and all other Entities whose interests are affected in any way by the Plan.

9.2     <u>Discharge</u>.   Pursuant to the provisions of 11 U.S.C. §§ 105, 524 and 1141(d) and as except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the Confirmation Order shall discharge and release, as of the Effective Date, the Debtors, their estates and all of their respective property from any and all claims, debts, liens, security interests, encumbrances and interests that arose before the Confirmation Date, including, but not limited to, all principal and any interest accrued and debts of the kind specified in 11 U.S.C. § 502(g), 502(h) and 502(i) whether or not (a) a proof of claim or interest based upon such Claim, debt, right or Interest is filed or deemed filed under 11 U.S.C. § 501; (b) a Claim or Interest based upon such Claim, debt, right or Interest is

allowed under 11 U.S.C. § 502; or (c) the holder of a Claim, debt, right or Interest accepted the Plan.  In addition, subject to the provisions of this Plan and any contract, instrument, or other agreement or document created pursuant to the Plan, the Distributions made under the Plan and any contract, instrument, or other agreement or document created pursuant to the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all claims against the Debtors and any of their respective assets or property, including claims for interest accruing after the Petition Date and prior to the Effective Date.  On or after the Effective Date, except as expressly provided in the Plan, all holders of Claims arising prior to the Confirmation Date shall, to the fullest extent possible under applicable law, be permanently barred and enjoined from asserting against the Debtors or their assets or property any further or other claims, including claims based on any act or omission, transactions or other activity of any kind or nature that occurred prior to the Confirmation Date.

  9.3  <u>Exculpation and Releases</u>.

  (a) Exculpation.  To the extent permitted by applicable law, and except as expressly provided in the Plan or Confirmation Order, from and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Debtor or Holder of a Claim or Interest, or any other party-in-interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, formulating, the Plan and the Disclosure Statement, the solicitation of acceptances of the Plan, the pursuit of approval of the Disclosure Statement and confirmation of the Plan, the confirmation of the Plan, the Plan Documents, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, or the restructuring transactions contemplated under the Plan and any actions

taken or documents executed and delivered that are incidental thereto; *provided, however*, that the foregoing provision shall not apply to an act or omission that is subsequently determined by a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence; provided, further, however, that any act approved by Final Order of the Bankruptcy Court shall be deemed not to constitute willful misconduct or gross negligence.  Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b) Releases by the Debtors.  To the extent permitted by applicable law, as of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the restructuring of the Debtors and the implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, the Debtors and the Reorganized Debtors, in their individual capacities and as debtors-in-possession on behalf of the Debtors' Estates, will be deemed to release and forever waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Released Parties, the Chapter 11 Cases, the Plan or this Disclosure Statement, or any document or agreement related thereto that the Debtors or the Reorganized Debtors had or have against the Released Parties (directly, indirectly, derivatively, in representative capacity or otherwise); *provided, however*, that the foregoing provision shall not apply to an act or omission that is determined by

a Final Order of the Bankruptcy Court to have constituted willful misconduct or gross negligence.

(c) Releases by Holders of Claims and Interests.  To the extent permitted by applicable law, as of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, each Holder of a Claim or an Interest who votes to accept the Plan, or who, directly or indirectly, is entitled to receive a distribution under the Plan, including Persons entitled to receive a distribution via an attorney, agent, or trustee, or who is the Holder of an Unimpaired Claim shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, *provided, however*, that the foregoing release shall not operate to waive or release any Causes of Action of any releasing party: (1) against a Released Party arising from the contractual obligations owed to the releasing party (other than pursuant to the Senior Credit Agreement and the Subordinated Credit Agreement); (2) expressly set forth in and preserved by the Plan, the Plan Supplement, Plan Documents or other related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct, or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement and other Plan Documents) executed to implement the Plan.

(d) Injunction Related to Exculpation and Releases.  All Persons that have held, hold or may hold any liabilities released or exculpated pursuant to this section of the Plan will be permanently enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any Lien; (iv) except as provided in the Plan, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

9.4    Release of Claims Against Professionals.  On the Effective Date, Retained Professionals are hereby released and shall neither have nor incur any liability, other than for gross negligence or willful misconduct, to the Debtors, the Estate, the Reorganized Debtors, or any creditor or interested party for any action taken or omitted to be taken in connection with or related to the Chapter 11 Cases, including, without limitation, the formulation, preparation, dissemination, implementation or confirmation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document including but not limited to any other action taken or omitted in connection with the Plan or the Disclosure Statement.

9.5    Non-Release of Co-Makers and Guarantors.  Nothing herein shall in any way alter, affect, or release the liability of any co-makers or guarantors on any Claims other than the Debtors as provided in the Plan.

**ARTICLE X**
**ALTERNATIVES TO THE PLAN**

10.1   Alternatives to confirmation of the Plan consist of conversion of the case to a Chapter 7 proceeding or otherwise proceeding with liquidation.   A liquidation analysis is attached as **Exhibit B**.  As reflected in the liquidation analysis, Debtors and their management believe that the Chapter 7 liquidation of the Debtors would result in substantial diminution in the value to be realized by Holders of Claims entitled to distribution, as compared to the Distribution contemplated under the Plan.  Consequently, the Debtors believe that confirmation of the Plan will provide a substantially greater return to holders of claims than would Chapter 7 liquidations.

Additionally, if the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors may be liquidated pursuant to the provisions of a Chapter 11 liquidating plan.  In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in liquidation under Chapter 7.  Thus, a Chapter 11 liquidation might result in larger recoveries than in a Chapter 7 liquidation, but the delay in distributions could result in lower present values receive and higher administrative costs.  Moreover, any distribution to holders of claims under a Chapter 11 liquidation would likely be delayed substantially.  Finally, and most importantly, the Debtors believe that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the New Equity to be distributed under the Plan.  Accordingly, Debtors believe that Chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## ARTICLE XI
## RECOMMENDATION

11.1   The Debtors believe that confirmation and implementation of the Plan is preferable to dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases to Chapter 7 because it will provide the greatest recovery for unsecured creditors.  The Plan Proponents urge

all creditors and interest holders to accept the Plan and to evidence such acceptance by returning their ballots to the undersigned at the address below on or before 5:00 p.m., Central Daylight Time, on _____, 2018.

Respectfully submitted,

CARMODY MACDONALD P.C.

By: /s/ *Robert E. Eggmann* _____
    ROBERT E. EGGMANN #37374MO
    THOMAS H. RISKE #61838MO
    120 S. Central Avenue, Suite 1800
    St. Louis, Missouri  63105
    (314) 854-8600
    (314) 854-8660 – FAX
    ree@carmodymacdonald.com
    thr@carmodymacdonald.com

ATTORNEYS FOR DEBTORS